STATE OF OKLA
CLEVELAND COUNTY } S.S.
FILED
MAR 13 2023
In the office of the
Court Clerk MARILYN WILLIAMS

**DISTRICT COURT FOR CLEVELAND COUNTY**
**STATE OF OKLAHOMA**

| | |
|---|---|
| (1) JESICA STEWART, as Next Friend of Joseph Stewart, deceased,<br><br>Plaintiff,<br><br>v.<br><br>(2) TURN KEY HEALTH CLINICS, LLC<br><br>Defendants. | Case No.: CJ-2023-278<br><br>**ATTORNEY LIEN CLAIMED**<br>**JURY TRIAL DEMANDED** |

## PETITION

Jesica Stewart, as Next Friend of Joseph Stewart, submits this Petition against the above-named Defendants.

### I.

#### PARTIES, JURISDICTION, VENUE

1. Jescia Stewart is the widow of Joseph Stewart. She is a resident and citizen of Oklahoma.

2. Turn Key Health Clinics, LLC is a domestic for profit limited liability company that contracted to provide services at the Cleveland County Justice Center (CCJC). Upon information and belief, Turn Key bargained for status as an independent contractor and is therefore ineligible for any protections under the Oklahoma Governmental Immunity Act.

3. The events complained of herein occurred in Cleveland County, Oklahoma making jurisdiction and venue proper.

EXHIBIT 1

4. Plaintiff has timely complied with any prerequisites to filing suit, including serving a notice of claim on Turn Key consistent with 57 O.S.§ 566.4(B)(2) on June 17, 2022.[1]

II.

STATEMENT OF FACTS

5. Joseph was detained at the CCJC on June 12, 2021 and released July 14, 2021 at 8:57 p.m. into the custody of a deputy from Kingfisher County where Joseph had an unresolved legal issue.

6. The transporting deputy observed that Joseph was in poor condition as he transported him to the Kingfisher jail, which is approximately 60 miles away.

7. Upon arrival at the Kingfisher jail, medical staff refused admission based on Joseph's serious medical condition.

8. With the medical refusal, the transporting deputy took Joseph to a local hospital before Joseph was transferred to a hospital in Enid where he died the next day, July 15, 2021.

9. Hospital records document that Joseph presented to the emergency room with complaints of shortness of breath and unilateral leg swelling for the past month.

10. Upon information and belief, Joseph informed Turn Key of these conditions while at the CCJC.

11. Hospital records further document that Joseph's symptoms worsened over the last two weeks while at the CCJC.

12. Upon information and belief, Joseph informed Turn Key of his deteriorating condition while at the CCJC.

---

[1] Complying with the statute is not intended to reflect any admission that Plaintiff has any duty to satisfy the statutory requirements.

2

13. Hospital records document that Joseph was also coughing up large amounts of blood as his condition worsened at the CCJC.

14. Upon information and belief, Joseph informed Turn Key staff that he was coughing up blood and that his condition was worsening.

15. Hospital records document that Joseph died with acute bacterial endocarditis, acute respiratory failure, congestive heart failure, and hyponatremia.

16. Hospital records document that Joseph was also suffering from elevated brain natriuretic peptide (BNP) levels, elevated liver function, elevated INR, normocytic anemia, hemoptysis, acute pulmonary edema, and pleural effusion.

17. Upon information and belief, Joseph had repeatedly and consistently communicated his deteriorating condition to Turn Key staff at the CCJC, and despite his efforts to obtain care, Turn Key failed to take any reasonable steps to address his worsening condition.

18. As a for-profit medical provider, Turn Key maintains a custom, practice, and policy of disregarding and minimizing people's medical complaints, failing to order diagnostic testing, failing to timely send patients to the hospital in order to save money and increase profits, understaffing, and using nurses to practice medicine recklessly outside their scope.

19. In many of their contracts, Turn Key agrees to cover all costs, up to a limit, for people who require diagnostic testing or outside medical services, including hospitalization and specialized treatment for serious illnesses and medical emergencies.

20. In its contract with Cleveland County, Turn Key agreed to cover only $50,000 in offsite and specialty care costs per year, and only $40,000 in medication (both prescription and

over the counter), despite understanding there would be, on average, approximately 350 detainees in their care.

21. Prior to Joseph's detention at the CCJC, the adequacy of services provided by Turn Key was implicated in several other incidents, including:

a) In 2009, Lacee Danielle Marez was booked into the Cleveland County Jail for missing a court appearance. During a tussle with jail staff Ms. Marez, only 21 years old, struck her head on a concrete floor and suffered a traumatic brain injury. Over the next several days Ms. Marez repeatedly asked for medical treatment, began vomiting, urinating on herself, and laying lethargic in her bed. ESW Correctional Healthcare (a previous iteration of Turn Key Health Clinics, LLC) staff ignored Ms. Marez's requests for medical attention and obviously serious symptoms. Medical staff abandoned Ms. Marez in a holding cell for three days, where she slipped into a coma and suffered a heart attack. Ms. Marez lived in a vegetative state for several years but eventually passed away. In 2014, Turn Key paid a confidential amount to settle a federal civil rights lawsuit related to this incident.

b) Curtis Gene Pruett was only 36 years old when he died in a holding cell at Cleveland County Jail in October 2011 after staff ignored his repeated pleas for emergency medical attention. Mr. Pruett told medical staff that he had high blood pressure and was in severe pain. Surveillance video showed Mr. Pruett doubled over and clutching his chest, but rather than assess Mr. Pruett or refer him to a higher-level caregiver, a nurse accused Mr. Pruett of faking his condition. Mr. Pruett subsequently died of a heart attack. Turn Key settled a lawsuit related to the incident in 2014.

c) While detained at the Cleveland County Detention Center in November of 2014, Robert Allen Autry developed a sinus infection. Both he and his mother informed Turn Key

medical staff that a traumatic brain injury he suffered as a teenager made him particularly susceptible to sinus infections causing life threatening brain infections. Mr. Autry and his mother repeatedly asked medical staff to provide antibiotics, but none were provided. Approximately two weeks after she initially contacted medical staff about her son's condition and need for care, Turn Key staff called Mr. Autry's mother asking her to provide written consent for Mr. Autry to receive emergency surgery. He had been found unconscious in his cell and had been transported to the hospital. Later the same day, Mr. Autry was diagnosed with "a serious bacterial infection in his brain as a result of an untreated sinus infection," and underwent emergency brain surgery. Mr. Autry underwent a series of other operations and procedures to place a feeding tube, insert a tracheal tube, and replace a cranial monitoring probe. Eventually, the treating physician determined Mr. Autry "was totally incapacitated from a brain injury resulting from a brain abscess and subdural empyema" and "would likely never return to an independent state."

d) In June 2016, Turn Key medical staff at Garfield County, Oklahoma Jail did nothing to intervene while Anthony Huff, who was experiencing delusions and hallucinations, was kept in a restraint chair for more than 55 hours. Mr. Huff was ultimately found unresponsive in the chair and pronounced dead. After a federal wrongful death lawsuit was filed on Mr. Huff's behalf, two Turn Key nurses and various jail staff were each charged with felony second-degree manslaughter. In October 2019, Garfield County paid $12.5 million to settle the case, to which Turn Key contributed a confidential amount.

e) Anthony Kade Davis also died in June 2016 after being found naked, unconscious, and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. In the days leading up to his death Mr. Davis was screaming, shouting that he was in pain, and pleading for assistance. He was known to

5

be ill and experiencing serious and dangerous symptoms including black, foul-smelling feces that had the appearance of coffee grounds. Despite knowing of these serious symptoms, Turn Key medical staff did not assess Mr. Davis or perform any diagnostic tests to determine the cause. A federal civil rights lawsuit arising from Mr. Davis's death was filed in 2017.

f) Michael Edwin Smith became permanently paralyzed in the Muskogee County Jail in the summer of 2016 when Turn Key staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Mr. Smith had cancer, which spread to his spine, causing a dangerous spinal compression – a condition that can cause permanent paralysis if untreated. When he told the Turn Key-employed physician at the jail that he was paralyzed, the doctor laughed at Mr. Smith and told him he was faking. For a week before he was able to bond out of the jail, Mr. Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself, or use the bathroom on his own. He lay in his own urine and feces because the jail staff accused Mr. Smith of faking paralysis and refused to help him. Turn Key settled a lawsuit arising from the incident in 2018.

g) On August 28, 2016, Andrew Bowen arrived at the Greene County Jail having been severely beaten by the arresting Greene County Sheriff's Deputy. He was bleeding from the head, unconscious, and exhibiting agonal breathing/loud snoring – a clear indicator of severe head and brain injury. While jail staff laughed at Mr. Bowen, a Turn Key nurse attempted to awaken Mr. Bowen without success. Despite recognizing that Mr. Bowen needed emergency medical care, and that she was not equipped with the necessary equipment to assist Mr. Bowen in this medical emergency, the nurse did not provide any timely assessment or treatment, or arrange for Mr. Bowen's transfer. Rather, no ambulance was called until after jail employees cleaned the blood off him, changed him out of his blood-soaked clothes, and booked him into the jail. When

6

he finally arrived at the hospital Mr. Bowen had a large hematoma on his forehead and a gaping laceration on his chin. He was unconscious, experiencing seizures, and had to be intubated due to respiratory failure. After a month in the hospital Mr. Bowen was released to a step-down facility, but never fully recovered from the severe brain injury and the delay in treatment he suffered. Turn Key settled a federal civil rights lawsuit arising from the incident in April 2019.

      h)      Russell Ted Foutch died September 30, 2016, after staff at the Creek County Jail observed him foaming at the mouth and coughing up blood. Before his death, Mr. Foutch complained of shortness of breath, lost consciousness multiple times in front of jail staff, and reported coughing up blood. Other inmates and Mr. Foutch's family noticed that he was ill and asked that he receive treatment. Mr. Foutch laid in his cell and slowly died from complications related to pneumonia without ever receiving the medically appropriate treatment and care he so desperately and obviously needed to save his life.

      i)      When James Buchanan was booked into the Muskogee County Jail in November 2016, he informed staff that he had been in a car accident and was suffering from broken ribs, a collapsed lung, and neck problems. He was nonetheless placed in a general population pod where, over the course of the next ten days, Mr. Buchanan became quadriplegic one limb at a time because a cervical epidural abscess was allowed to fester. Turn Key medical staff were aware that Mr. Buchanan was experiencing sudden and expanding paralysis but did nothing, even after he lost the ability to feed and hydrate himself. Rather they looked on as other inmates helped Mr. Buchanan eat, drink, and use the toilet, and scheduled him for a visit with the doctor the following week. It was only when Mr. Buchanan was found lying in a puddle of his own urine, complaining of 10/10 pain nearly 11 days after the initial onset of his symptoms that he was finally sent to the hospital. Mr. Buchanan remained paralyzed and permanently disabled despite spinal surgery.

j) On December 14, 2016, 41-year-old Sharon Lavette Alexander of Little Rock, Arkansas, died at Pulaski County Jail. She had been booked into custody the day before her death. When she was processed into the jail, her asthma inhaler was taken from her and not returned. An autopsy revealed acute exacerbation of asthma was the cause of her death. A federal wrongful death lawsuit was filed by Alexander's family in January 2018. In May 2019 the case settled for $425,000 – Pulaski County paid $50,000 and Turn Key paid $375,000 to the family.

k) On February 15, 2017, Trillus Smith died in the Pulaski County Regional Detention Facility from acute pneumonia and dehydration. In the two weeks preceding her death, Turn Key medical staff observed that Ms. Smith was becoming less oriented to reality, unable to communicate, lethargic, not eating or drinking, and that her eyes were rolling in her head. Several nurses collected dangerously abnormal vital signs including critically low blood pressures on February 13th and 14th. Ms. Smith's blood labs also indicated a life-threatening condition. Despite these critically abnormal vital signs and values, Ms. Smith was never assessed by a higher-level caregiver or transported to the hospital. Rather, she was left alone in her cell to die.

l) On June 10, 2017, Ronald Garland was brought to the Creek County Detention Center, a Turn Key facility, on charges of driving under the influence. No intake medical screening was performed and Mr. Garland was placed in a housing unit. More than 12 hours later a nurse noted that a jail staff member alerted her Mr. Garland was "acting weird" in the housing unit. She assessed Mr. Garland shortly thereafter and noted he denied being under the influence of any drugs or alcohol, that he was unable to answer orientation questions, he was moaning and yelling, could not focus or sit still. She charted his vital signs as a range and noted that Mr. Garland needed a medical assessment ASAP as he was potentially detoxing. Two hours later, the same nurse noted that Mr. Garland was confused, experiencing active visual hallucinations, but non

combative. Despite his obviously worsening condition, this nurse did not take any steps to provide Mr. Garland with care or determine the cause of his symptoms. Later that night, deputies moved Mr. Garland to a restraint chair and shoved his head downward between his knees, putting extreme pressure on his chest and diaphragm, causing Mr. Garland to go limp. At the hospital, Mr. Garland was diagnosed with an anoxic brain injury from which he did not recover and subsequently passed away. In its Order denying Turn Key's Motion to Dismiss the Court emphasized:

> [nurse] Janes allegedly was aware that Garland was moaning, yelling, and banging on the cell door, suggesting that he was in some discomfort. The pleading also alleges facts from which the court may infer that Janes subjectively knew that Garland's condition was deteriorating—specifically, that, at nine o'clock, Garland experienced symptoms of visual hallucinations and confusion that were not documented at the six o'clock hour. Finally, the Second Amended Complaint alleges that '[a]t no point did Janes . . . take any steps to provide [Garland] with any care despite the severe risk from unscreened detoxification, and despite actual knowledge that [Garland's] condition was worsening.' Taking these allegations as true and viewing them in the light most favorable to plaintiff, the Second Amended Complaint includes plausible allegations from which the court may infer that Janes knew of the risk that Garland's condition was worsening, resulting in increasingly severe symptoms, and chose to disregard it. Thus, the Second Amended Complaint states a plausible claim that Janes acted with deliberate indifference to Gardner's serious medical needs by recklessly failing to treat Garland properly.

*Bush v. Bowling*, No. 19-CV-00098-GKF-FHM, 2020 U.S. Dist. LEXIS 8495, at *16-17 (N.D. Okla. Jan. 17, 2020). A lawsuit regarding Mr. Garland's death settled in 2021 when Creek County paid Mr. Garland's Estate $750,000 and Turn Key paid an additional confidential amount.

        m)      On August 20, 2017, Rebecca Royston was booked into the Bryan County Detention Center without an intake medical screening even though deputies observed her being unsteady on her feet and believed her to be highly intoxicated. Despite suspecting that Ms. Royston was intoxicated and knowing there were no medical personnel on site, deputies placed Ms. Royston in an isolation cell, hog-tied her, and left. Shortly thereafter, deputies observed Ms.

Royston banging her head against concrete. Rather than arranging for a medical assessment, deputies entered Ms. Royston's cell and put her in a football helmet so she wouldn't strike her head again while still in the hog-tie. When a Turn Key nurse finally saw Ms. Royston, she charted that she was unable to obtain vital signs, unable to communicate with the patient, and occasionally Ms. Royston's eyes would open and roll back. Despite knowing she had banged her head on concrete and observing Ms. Royston's obviously emergent condition, the nurse did nothing to secure higher level care, leaving Ms. Royston to languish on the ground, rolling side to side in extraordinary pain, for more than four hours, at which time security staff made the decision to send Ms. Royston to the hospital. A CT scan revealed Ms. Royston had suffered intercranial hemorrhaging. Turn Key settled a lawsuit arising from the incident in 2021.

n) Twenty-five-year-old Caleb Lee died on September 24, 2017, as a result of a cardiopulmonary arrest after Turn Key medical staff at the Tulsa County Jail ignored his serious and worsening symptoms for days. When he was booked into the jail, staff noted that Mr. Lee was being treated at a methadone clinic daily and that, by then, it had been about 48 hours since his last dose. Turn Key staff knew that Mr. Lee also had cardiac disease, hypertension, and was already experiencing withdrawal. By his second day in the jail Mr. Lee was hallucinating, and over the course of the next several days his vital signs became abnormal. The onset of hallucinations and abnormal vital signs were clear signals that there was an underlying and emergent medical condition. Mr. Lee continued to deteriorate – he was not eating and was visibly shaking and delusional. Turn Key medical staff nonetheless canceled three follow up appointments and did not secure higher-level evaluation and treatment for Mr. Lee. Finally, the day before his death, detention officers moved Mr. Lee from his cell to the medical unit when he was found lying on the floor complaining of chest pain. He began convulsing and foaming at the mouth when he

arrived at the medical unit, but medical personnel did not offer any treatment while Mr. Lee was convulsing. Mr. Lee was eventually transported to the hospital, where he died. A lawsuit alleging Turn Key medical staff were deliberately indifferent to Mr. Lee's serious medical needs was settled in February 2022.

o) On October 17, 2017, Brenda Jean Sanders was booked into the Creek County Justice Center for outstanding warrants. While in the jail and under the care and control of the Turn Key medical personnel, Ms. Sanders' health dangerously deteriorated. Medical personnel and jail staff noted that she had been suffering from diarrhea and her mental state had been rapidly declining for at least two to three weeks. As her health obviously and swiftly deteriorated, medical personnel never provided Ms. Sanders any care, nor did they ever even obtain her medical history. On or about November 20, 2016, a full 35 days after entering the Creek County Justice Center, Turn Key medical personnel and jail staff finally had Ms. Sanders transported to the hospital after she had become fully incapacitated and was on the brink of death. At the hospital Ms. Sanders was diagnosed with "severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, coagulopathy, anemia, and thrombocytopenia." Ms. Sanders died the day after her admittance to the hospital. A lawsuit alleging Turn Key medical staff were deliberately indifferent to Ms. Sanders' serious medical needs is ongoing.

p) On October 30, 2018, Angela Yost died after six days of suffering without medical attention at the Ottawa County Jail. Medical staff at the jail were well-acquainted with Ms. Yost and were aware she had several serious medical conditions, including that she had recently been hospitalized for a poorly-healing wound, cellulitis, and DVT in her left leg. Still, she did not see a nurse and was not provided any medications for the first three days she was at the jail, even as her condition observably declined. During the first three days, Ms. Yost's pain in her

11

left leg increased and the wound began to secrete a yellow discharge and foul odor. She struggled to move, laid on the floor, and complained that she needed to be seen by a doctor and receive her medications. When Ms. Yost was finally assessed, the Turn Key nurse did not refer Ms. Yost to a higher level of care, or even make a plan for her to be seen by a doctor or NP, despite the fact that she had numerous and serious co-morbidities, had not received any medications for three days, and obviously had an active infection. Rather, the nurse informed a Nurse Practitioner of Ms. Yost's condition, and despite the NP's awareness that Ms. Yost had an active infection and serious co- morbidities, she also did nothing. Ms. Yost continued to observably deteriorate over the next three days. On the morning of October 30, she was helped to the shower where she collapsed and was unresponsive. She was pronounced dead 17 minutes after she arrived at the emergency room. A lawsuit arising from her death was filed in 2020.

q)  In November 2018, Misty Bailey, a pretrial detainee at Ottawa County Jail, began to suffer from severe chest pain and elevated heart rate. She eventually started vomiting, could not keep down any food or medications, and also began experiencing lower back pain and severe pain when urinating. Despite being informed of these symptoms, Turn Key medical staff refused to assess Ms. Bailey or send her to the hospital. For two days Ms. Bailey continued to deteriorate, eventually experiencing a fever of 103 degrees and a seizure, at which point detention staff informed Ms. Bailey she would be taken to the hospital only if she agreed to be released on her own recognizance and assume financial responsibility for her medical care. At the hospital Ms. Bailey was diagnosed with a bacterial UTI infection that had progressed to her kidney. In its Order denying Turn Key's motion to dismiss, the court emphasized that *Monell* liability is adequately alleged at the pleading stage where plaintiff points to comparable instances at other facilities operated by Turn Key: "Plaintiff cites numerous instances at other prison medical facilities

operated by Turn Key in which medical care was inadequate or denied altogether, and she alleges that the poor medical care is the result of a custom or policy of Turn Key to cut costs and prioritize financial gain over the delivery of constitutionally adequate medical care. At the pleading stage, the Court finds that plaintiff's allegations are sufficient to support an inference that plaintiff was denied medical care for serious condition due to an official policy or custom, and Turn Key's motion to dismiss should be denied." Bailey v. Turn Key Health Clinics, LLC, No. 20-CV-0561-CVE-SH, 2021 U.S. Dist. LEXIS 177310, at *18-19 (N.D. Okla. Sep. 17, 2021). The case appears to have settled confidentially as a stipulation of dismissal was filed on December 10, 2021.

r) Lesley Sara Hendrix died on October 12, 2020, after repeated requests for medical attention were disregarded and denied. Ms. Hendrix developed a rash on her legs in early October, which she reported to Turn Key medical personnel, but nothing was done to address this condition. Approximately one week before her death, she asked the nurse dispensing medications to arrange for a medical evaluation because she was not feeling well, experiencing nausea, severe pain, dizziness, and vomiting. Turn Key staff told Ms. Hendrix that they would not permit her to make an appointment orally and that she would have to use a computer kiosk. The only kiosk Ms. Hendrix had access to was broken, and no other means of scheduling an appointment were provided. By October 10, Ms. Hendrix was pale with black circles and bags under her eyes, incoherent, acting erratically, struggling to stand, and complaining that she felt like she was dying. Having seen on a video visit the dire condition her daughter was in, Ms. Hendrix's mother called the jail and told staff she required immediate medical attention, but Ms. Hendrix received none. The next day Ms. Hendrix collapsed and was finally transported to the hospital. Upon her arrival Ms. Hendrix was in critical condition, was in acute respiratory distress, metabolic acidosis and severe septic shock. During the emergency medical assessment hospital staff found Ms. Hendrix

had an enormous black, bulging wound to her perineum, lower abdomen, buttocks, and genitals caused by necrotizing fasciitis. Ms. Hendrix died the following morning in the ICU at the hospital. A federal lawsuit related to her death is ongoing.

22. These prior deaths provided Turn Key with notice that it's medical care delivery system is inadequate and exposed people to a substantial risk of serious harm or death.

23. Despite this knowledge, Turn Key failed to take any reasonable steps to correct the deficiencies in the medical care delivery system at the CCJC.

## IV.

### STATEMENT OF CLAIMS

### NEGLIGENCE
### TURN KEY

24. Plaintiff adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

25. A special relationship existed between Turn Key and Joseph arising out of his status as a pretrial detainee. Turn Key owed Joseph a duty of reasonable care in the provision of medical care while Joseph was detained at the CCJC, and Turn Key breached that duty by repeatedly failing to provide adequate care to Joseph consistent with basic correctional medical standards. As a direct and proximate result of Turn Key's failure to provide adequate medical care, Joseph suffered injuries and damages for which Turn Key is liable.

## V.

### RELIEF REQUESTED

26. Plaintiff respectfully requests the Court enter judgment against the Defendant and enter such other relief as the Court deems just and equitable, to include, without limitations, an award of compensatory and punitive damages in excess of $75,000.00, along with any other legal

or equitable relief to which the Plaintiff is entitled.

                          Respectfully submitted,

                          BRYAN & TERRILL

                          _____
                          J. Spencer Bryan, OBA # 19419
                          Steven J. Terrill, OBA # 20869
                          BRYAN & TERRILL LAW, PLLC
                          2500 S. Broadway, Suite 122
                          Edmond, OK 73103
                          Tele/Fax:    (918) 935-2777
                          sjterrill@bryanterrill.com
                          *Attorneys for Plaintiff*