

*105592982 6*

# DISTRICT COURT FOR CLEVELAND COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA ]
CLEVELAND COUNTY ] S.S.
FILED

JUL 14 2023

In the office of the
Court Clerk MARILYN WILLIAMS

(1)   JESICA STEWART, as Next Friend of
      Joseph Stewart, deceased,

                Plaintiff,

v.                                              Case No.: CJ-2023-278

(2)   TURN KEY HEALTH CLINICS, LLC,
(3)   NATASHA KARIUKI,
(4)   ANGELA ALBERTSON,
(5)   BECKY PATA,
(6)   CHRISTINA MEZA,
(7)   CHRIS AMASON, in his official
      capacity as Sheriff of
      Cleveland County,

                Defendants.

---

## AMENDED PETITION

---

Jesica Stewart, as Next Friend of Joseph Stewart, submits this Amended Petition against the above-named Defendants.

### I.

#### PARTIES, JURISDICTION, VENUE

1.     Jescia Stewart is the widow of Joseph Stewart. She is a resident and citizen of Oklahoma.

2.     Turn Key Health Clinics, LLC is a domestic for profit limited liability company that contracted to provide services at the Cleveland County Justice Center (CCJC). Upon information and belief, Turn Key bargained for status as an independent contractor and is therefore ineligible for any protections under the Oklahoma Governmental Immunity Act.

**EXHIBIT**

**2**

3.      Natasha Kariuki, Angela Albertson, Becky Pata, and Christina Meza are or were employees of Turn Key who, upon information and belief, acted consistent with Turn Key written policy or unwritten practices throughout their encounters with Plaintiff's decedent. Upon information and belief, no one was disciplined as a result of the death of Plaintiff's decedent.

4.      Chris Amason, in his official capacity (Amason), is the final policymaker for the operational aspects of the CCJC. Amason is required by law to comply with the Oklahoma Jail Standards, and he must provide a jail facility that is adequate for the safekeeping of inmates. Amason has a non-delegable duty to provide adequate medical care to people confined at the CCJC.

5.      The events complained of herein occurred in Cleveland County, Oklahoma making jurisdiction and venue proper.

6.      Plaintiff has timely complied with any prerequisites to filing suit, including serving a notice of claim on Turn Key consistent with 57 O.S.§ 566.4(B)(2) on June 17, 2022.[1]

## II.

### STATEMENT OF FACTS

**A.      THE INADEQUATE MEDICAL DELIVERY SYSTEM AT THE CCJC**

7.      Amason contracted to give Turn Key public money. In return, Turn Key agreed to provide medical staff that would deliver medical services at the CCJC pursuant to written policies and unwritten practices created, adopted, maintained, and enforced by Turn Key.

---

[1] Complying with the statute is not intended to reflect any admission that Plaintiff has any duty to satisfy the statutory requirements.

8.      Pursuant to the contract, while Turn Key assumed full responsibility for the medical delivery system at the CCJC, Amason retained full responsibility for supervising persons held at the CCJC, including those in medical segregation and those who needed medical care.

9.      Despite this responsibility, post-incident records from the Oklahoma State Department of Health show that CCJC staff failed to perform required safety checks on critical care detainees by disregarding written policy that required increased supervision of at-risk persons.

10.     Upon information and belief, the practice of disregarding the policy requiring increased supervision was ongoing in June 2021.

11.     In the setting of pretrial detention of medically compromised persons, decreased supervision corelates with increased risk to people suffering from chronic care illnesses who will deteriorate over the course of their detention.

12.     Upon information and belief, there was no cross-training between custodial and medical staff to ensure adequate supervision of medically compromised individuals.

13.     Upon information and belief, the lack of cross-training between Amason and Turn Key caused each entity to view the other as having primary responsibility for supervising the serious medical needs of medically compromised detainees.

14.     By dispersing responsibility across multiple persons and entities, and by failing to provide adequate training to ensure staff provided adequate supervision, Amason and Turn Key adopted, maintained, and enforced a policy or practice of inadequate supervision that exposed people like Joseph to a substantial risk of serious harm.

15.     Upon information and belief, Turn Key maintained a custom, practice, and policy at the CCJC of disregarding or minimizing people's medical complaints to save money and

3

increase profits through rationing care, understaffing, and/or using staff to recklessly practice medicine outside their scope.

16.     In many of their contracts, Turn Key agrees to cover all costs, up to a limit, for people who require diagnostic testing or outside medical services, including hospitalization and specialized treatment for serious illnesses and medical emergencies.

17.     In its contract with Cleveland County, Turn Key agreed to cover only $50,000 in offsite and specialty care costs per year, and only $40,000 in medication (both prescription and over the counter), despite understanding there would be, on average, approximately 350 detainees in their care.

18.     Prior to Joseph's detention at the CCJC, the adequacy of services provided either at the CCJC or by Turn Key was implicated in several other incidents, including:

        a)      In 2009, Lacee Danielle Marez was booked into the Cleveland County Jail for missing a court appearance. During a tussle with jail staff Ms. Marez, only 21 years old, struck her head on a concrete floor and suffered a traumatic brain injury. Over the next several days Ms. Marez repeatedly asked for medical treatment, began vomiting, urinating on herself, and laying lethargic in her bed. ESW Correctional Healthcare (a previous iteration of Turn Key Health Clinics, LLC) staff ignored Ms. Marez's requests for medical attention and obviously serious symptoms. Medical staff abandoned Ms. Marez in a holding cell for three days, where she slipped into a coma and suffered a heart attack. Ms. Marez lived in a vegetative state for several years but eventually passed away. In 2014, Turn Key paid a confidential amount to settle a federal civil rights lawsuit related to this incident.

        b)      Curtis Gene Pruett was only 36 years old when he died in a holding cell at Cleveland County Jail in October 2011 after staff ignored his repeated pleas for emergency medical

4

attention. Mr. Pruett told medical staff that he had high blood pressure and was in severe pain. Surveillance video showed Mr. Pruett doubled over and clutching his chest, but rather than assess Mr. Pruett or refer him to a higher-level caregiver, a nurse accused Mr. Pruett of faking his condition. Mr. Pruett subsequently died of a heart attack. Turn Key settled a lawsuit related to the incident in 2014.

c)      While detained at the Cleveland County Detention Center in November of 2014, Robert Allen Autry developed a sinus infection. Both he and his mother informed Turn Key medical staff that a traumatic brain injury he suffered as a teenager made him particularly susceptible to sinus infections causing life threatening brain infections. Mr. Autry and his mother repeatedly asked medical staff to provide antibiotics, but none were provided. Approximately two weeks after she initially contacted medical staff about her son's condition and need for care, Turn Key staff called Mr. Autry's mother asking her to provide written consent for Mr. Autry to receive emergency surgery. He had been found unconscious in his cell and had been transported to the hospital. Later the same day, Mr. Autry was diagnosed with "a serious bacterial infection in his brain as a result of an untreated sinus infection," and underwent emergency brain surgery. Mr. Autry underwent a series of other operations and procedures to place a feeding tube, insert a tracheal tube, and replace a cranial monitoring probe. Eventually, the treating physician determined Mr. Autry "was totally incapacitated from a brain injury resulting from a brain abscess and subdural empyema" and "would likely never return to an independent state."

d)      In June 2016, Turn Key medical staff at Garfield County, Oklahoma Jail did nothing to intervene while Anthony Huff, who was experiencing delusions and hallucinations, was kept in a restraint chair for more than 55 hours. Mr. Huff was ultimately found unresponsive in the chair and pronounced dead. After a federal wrongful death lawsuit was filed on Mr. Huff's

behalf, two Turn Key nurses and various jail staff were each charged with felony second-degree manslaughter. In October 2019, Garfield County paid $12.5 million to settle the case, to which Turn Key contributed a confidential amount.

e)   Anthony Kade Davis also died in June 2016 after being found naked, unconscious, and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. In the days leading up to his death Mr. Davis was screaming, shouting that he was in pain, and pleading for assistance. He was known to be ill and experiencing serious and dangerous symptoms including black, foul-smelling feces that had the appearance of coffee grounds. Despite knowing of these serious symptoms, Turn Key medical staff did not assess Mr. Davis or perform any diagnostic tests to determine the cause. A federal civil rights lawsuit arising from Mr. Davis's death was filed in 2017.

f)   Michael Edwin Smith became permanently paralyzed in the Muskogee County Jail in the summer of 2016 when Turn Key staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Mr. Smith had cancer, which spread to his spine, causing a dangerous spinal compression – a condition that can cause permanent paralysis if untreated. When he told the Turn Key-employed physician at the jail that he was paralyzed, the doctor laughed at Mr. Smith and told him he was faking. For a week before he was able to bond out of the jail, Mr. Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself, or use the bathroom on his own. He lay in his own urine and feces because the jail staff accused Mr. Smith of faking paralysis and refused to help him. Turn Key settled a lawsuit arising from the incident in 2018.

g)   On August 28, 2016, Andrew Bowen arrived at the Greene County Jail having been severely beaten by the arresting Greene County Sheriff's Deputy. He was bleeding

from the head, unconscious, and exhibiting agonal breathing/loud snoring – a clear indicator of severe head and brain injury. While jail staff laughed at Mr. Bowen, a Turn Key nurse attempted to awaken Mr. Bowen without success. Despite recognizing that Mr. Bowen needed emergency medical care, and that she was not equipped with the necessary equipment to assist Mr. Bowen in this medical emergency, the nurse did not provide any timely assessment or treatment, or arrange for Mr. Bowen's transfer. Rather, no ambulance was called until after jail employees cleaned the blood off him, changed him out of his blood-soaked clothes, and booked him into the jail. When he finally arrived at the hospital Mr. Bowen had a large hematoma on his forehead and a gaping laceration on his chin. He was unconscious, experiencing seizures, and had to be intubated due to respiratory failure. After a month in the hospital Mr. Bowen was released to a step-down facility, but never fully recovered from the severe brain injury and the delay in treatment he suffered. Turn Key settled a federal civil rights lawsuit arising from the incident in April 2019.

h)      Russell Ted Foutch died September 30, 2016, after staff at the Creek County Jail observed him foaming at the mouth and coughing up blood. Before his death, Mr. Foutch complained of shortness of breath, lost consciousness multiple times in front of jail staff, and reported coughing up blood. Other inmates and Mr. Foutch's family noticed that he was ill and asked that he receive treatment. Mr. Foutch laid in his cell and slowly died from complications related to pneumonia without ever receiving the medically appropriate treatment and care he so desperately and obviously needed to save his life.

i)      When James Buchanan was booked into the Muskogee County Jail in November 2016, he informed staff that he had been in a car accident and was suffering from broken ribs, a collapsed lung, and neck problems. He was nonetheless placed in a general population pod where, over the course of the next ten days, Mr. Buchanan became quadriplegic one limb at a time

7

because a cervical epidural abscess was allowed to fester. Turn Key medical staff were aware that Mr. Buchanan was experiencing sudden and expanding paralysis but did nothing, even after he lost the ability to feed and hydrate himself. Rather they looked on as other inmates helped Mr. Buchanan eat, drink, and use the toilet, and scheduled him for a visit with the doctor the following week. It was only when Mr. Buchanan was found lying in a puddle of his own urine, complaining of 10/10 pain nearly 11 days after the initial onset of his symptoms that he was finally sent to the hospital. Mr. Buchanan remained paralyzed and permanently disabled despite spinal surgery.

j)    On December 14, 2016, 41-year-old Sharon Lavette Alexander of Little Rock, Arkansas, died at Pulaski County Jail. She had been booked into custody the day before her death. When she was processed into the jail, her asthma inhaler was taken from her and not returned. An autopsy revealed acute exacerbation of asthma was the cause of her death. A federal wrongful death lawsuit was filed by Alexander's family in January 2018. In May 2019 the case settled for $425,000 – Pulaski County paid $50,000 and Turn Key paid $375,000 to the family.

k)    On February 15, 2017, Trillus Smith died in the Pulaski County Regional Detention Facility from acute pneumonia and dehydration. In the two weeks preceding her death, Turn Key medical staff observed that Ms. Smith was becoming less oriented to reality, unable to communicate, lethargic, not eating or drinking, and that her eyes were rolling in her head. Several nurses collected dangerously abnormal vital signs including critically low blood pressures on February 13th and 14th. Ms. Smith's blood labs also indicated a life-threatening condition. Despite these critically abnormal vital signs and values, Ms. Smith was never assessed by a higher-level caregiver or transported to the hospital. Rather, she was left alone in her cell to die.

l)    On June 10, 2017, Ronald Garland was brought to the Creek County Detention Center, a Turn Key facility, on charges of driving under the influence. No intake medical

8

screening was performed and Mr. Garland was placed in a housing unit. More than 12 hours later a nurse noted that a jail staff member alerted her Mr. Garland was "acting weird" in the housing unit. She assessed Mr. Garland shortly thereafter and noted he denied being under the influence of any drugs or alcohol, that he was unable to answer orientation questions, he was moaning and yelling, could not focus or sit still. She charted his vital signs as a range and noted that Mr. Garland needed a medical assessment ASAP as he was potentially detoxing. Two hours later, the same nurse noted that Mr. Garland was confused, experiencing active visual hallucinations, but non combative. Despite his obviously worsening condition, this nurse did not take any steps to provide Mr. Garland with care or determine the cause of his symptoms. Later that night, deputies moved Mr. Garland to a restraint chair and shoved his head downward between his knees, putting extreme pressure on his chest and diaphragm, causing Mr. Garland to go limp. At the hospital, Mr. Garland was diagnosed with an anoxic brain injury from which he did not recover and subsequently passed away. In its Order denying Turn Key's Motion to Dismiss the Court emphasized:

> [nurse] Janes allegedly was aware that Garland was moaning, yelling, and banging on the cell door, suggesting that he was in some discomfort. The pleading also alleges facts from which the court may infer that Janes subjectively knew that Garland's condition was deteriorating—specifically, that, at nine o'clock, Garland experienced symptoms of visual hallucinations and confusion that were not documented at the six o'clock hour. Finally, the Second Amended Complaint alleges that '[a]t no point did Janes . . . take any steps to provide [Garland] with any care despite the severe risk from unscreened detoxification, and despite actual knowledge that [Garland's] condition was worsening.' Taking these allegations as true and viewing them in the light most favorable to plaintiff, the Second Amended Complaint includes plausible allegations from which the court may infer that Janes knew of the risk that Garland's condition was worsening, resulting in increasingly severe symptoms, and chose to disregard it. Thus, the Second Amended Complaint states a plausible claim that Janes acted with deliberate indifference to Gardner's serious medical needs by recklessly failing to treat Garland properly.

*Bush v. Bowling*, No. 19-CV-00098-GKF-FHM, 2020 U.S. Dist. LEXIS 8495, at *16-17 (N.D.

Okla. Jan. 17, 2020). A lawsuit regarding Mr. Garland's death settled in 2021 when Creek County paid Mr. Garland's Estate $750,000 and Turn Key paid an additional confidential amount.

        m)      On August 20, 2017, Rebecca Royston was booked into the Bryan County Detention Center without an intake medical screening even though deputies observed her being unsteady on her feet and believed her to be highly intoxicated. Despite suspecting that Ms. Royston was intoxicated and knowing there were no medical personnel on site, deputies placed Ms. Royston in an isolation cell, hog-tied her, and left. Shortly thereafter, deputies observed Ms. Royston banging her head against concrete. Rather than arranging for a medical assessment, deputies entered Ms. Royston's cell and put her in a football helmet so she wouldn't strike her head again while still in the hog-tie. When a Turn Key nurse finally saw Ms. Royston, she charted that she was unable to obtain vital signs, unable to communicate with the patient, and occasionally Ms. Royston's eyes would open and roll back. Despite knowing she had banged her head on concrete and observing Ms. Royston's obviously emergent condition, the nurse did nothing to secure higher level care, leaving Ms. Royston to languish on the ground, rolling side to side in extraordinary pain, for more than four hours, at which time security staff made the decision to send Ms. Royston to the hospital. A CT scan revealed Ms. Royston had suffered intercranial hemorrhaging. Turn Key settled a lawsuit arising from the incident in 2021.

        n)      Twenty-five-year-old Caleb Lee died on September 24, 2017, as a result of a cardiopulmonary arrest after Turn Key medical staff at the Tulsa County Jail ignored his serious and worsening symptoms for days. When he was booked into the jail, staff noted that Mr. Lee was being treated at a methadone clinic daily and that, by then, it had been about 48 hours since his last dose. Turn Key staff knew that Mr. Lee also had cardiac disease, hypertension, and was already experiencing withdrawal. By his second day in the jail Mr. Lee was hallucinating, and over the

course of the next several days his vital signs became abnormal. The onset of hallucinations and abnormal vital signs were clear signals that there was an underlying and emergent medical condition. Mr. Lee continued to deteriorate – he was not eating and was visibly shaking and delusional. Turn Key medical staff nonetheless canceled three follow up appointments and did not secure higher-level evaluation and treatment for Mr. Lee. Finally, the day before his death, detention officers moved Mr. Lee from his cell to the medical unit when he was found lying on the floor complaining of chest pain. He began convulsing and foaming at the mouth when he arrived at the medical unit, but medical personnel did not offer any treatment while Mr. Lee was convulsing. Mr. Lee was eventually transported to the hospital, where he died. A lawsuit alleging Turn Key medical staff were deliberately indifferent to Mr. Lee's serious medical needs was settled in February 2022.

o)     On October 17, 2017, Brenda Jean Sanders was booked into the Creek County Justice Center for outstanding warrants. While in the jail and under the care and control of the Turn Key medical personnel, Ms. Sanders' health dangerously deteriorated. Medical personnel and jail staff noted that she had been suffering from diarrhea and her mental state had been rapidly declining for at least two to three weeks. As her health obviously and swiftly deteriorated, medical personnel never provided Ms. Sanders any care, nor did they ever even obtain her medical history. On or about November 20, 2016, a full 35 days after entering the Creek County Justice Center, Turn Key medical personnel and jail staff finally had Ms. Sanders transported to the hospital after she had become fully incapacitated and was on the brink of death. At the hospital Ms. Sanders was diagnosed with "severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, coagulopathy, anemia, and thrombocytopenia." Ms. Sanders died the day after her admittance to the hospital. A lawsuit alleging Turn Key medical staff were deliberately indifferent

11

to Ms. Sanders' serious medical needs is ongoing.

p)     On October 30, 2018, Angela Yost died after six days of suffering without medical attention at the Ottawa County Jail. Medical staff at the jail were well-acquainted with Ms. Yost and were aware she had several serious medical conditions, including that she had recently been hospitalized for a poorly-healing wound, cellulitis, and DVT in her left leg. Still, she did not see a nurse and was not provided any medications for the first three days she was at the jail, even as her condition observably declined. During the first three days, Ms. Yost's pain in her left leg increased and the wound began to secrete a yellow discharge and foul odor. She struggled to move, laid on the floor, and complained that she needed to be seen by a doctor and receive her medications. When Ms. Yost was finally assessed, the Turn Key nurse did not refer Ms. Yost to a higher level of care, or even make a plan for her to be seen by a doctor or NP, despite the fact that she had numerous and serious co-morbidities, had not received any medications for three days, and obviously had an active infection. Rather, the nurse informed a Nurse Practitioner of Ms. Yost's condition, and despite the NP's awareness that Ms. Yost had an active infection and serious co- morbidities, she also did nothing. Ms. Yost continued to observably deteriorate over the next three days. On the morning of October 30, she was helped to the shower where she collapsed and was unresponsive. She was pronounced dead 17 minutes after she arrived at the emergency room. A lawsuit arising from her death was filed in 2020.

q)     In November 2018, Misty Bailey, a pretrial detainee at Ottawa County Jail, began to suffer from severe chest pain and elevated heart rate. She eventually started vomiting, could not keep down any food or medications, and also began experiencing lower back pain and severe pain when urinating. Despite being informed of these symptoms, Turn Key medical staff refused to assess Ms. Bailey or send her to the hospital. For two days Ms. Bailey continued to

deteriorate, eventually experiencing a fever of 103 degrees and a seizure, at which point detention staff informed Ms. Bailey she would be taken to the hospital only if she agreed to be released on her own recognizance and assume financial responsibility for her medical care. At the hospital Ms. Bailey was diagnosed with a bacterial UTI infection that had progressed to her kidney. In its Order denying Turn Key's motion to dismiss, the court emphasized that *Monell* liability is adequately alleged at the pleading stage where plaintiff points to comparable instances at other facilities operated by Turn Key: "Plaintiff cites numerous instances at other prison medical facilities operated by Turn Key in which medical care was inadequate or denied altogether, and she alleges that the poor medical care is the result of a custom or policy of Turn Key to cut costs and prioritize financial gain over the delivery of constitutionally adequate medical care. At the pleading stage, the Court finds that plaintiff's allegations are sufficient to support an inference that plaintiff was denied medical care for serious condition due to an official policy or custom, and Turn Key's motion to dismiss should be denied." Bailey v. Turn Key Health Clinics, LLC, No. 20-CV-0561-CVE-SH, 2021 U.S. Dist. LEXIS 177310, at *18-19 (N.D. Okla. Sep. 17, 2021). The case appears to have settled confidentially as a stipulation of dismissal was filed on December 10, 2021.

u)      Lesley Sara Hendrix died on October 12, 2020, after repeated requests for medical attention were disregarded and denied. Ms. Hendrix developed a rash on her legs in early October, which she reported to Turn Key medical personnel, but nothing was done to address this condition. Approximately one week before her death, she asked the nurse dispensing medications to arrange for a medical evaluation because she was not feeling well, experiencing nausea, severe pain, dizziness, and vomiting. Turn Key staff told Ms. Hendrix that they would not permit her to make an appointment orally and that she would have to use a computer kiosk. The only kiosk Ms. Hendrix had access to was broken, and no other means of scheduling an appointment were

provided. By October 10, Ms. Hendrix was pale with black circles and bags under her eyes, incoherent, acting erratically, struggling to stand, and complaining that she felt like she was dying. Having seen on a video visit the dire condition her daughter was in, Ms. Hendrix's mother called the jail and told staff she required immediate medical attention, but Ms. Hendrix received none. The next day Ms. Hendrix collapsed and was finally transported to the hospital. Upon her arrival Ms. Hendrix was in critical condition, was in acute respiratory distress, metabolic acidosis and severe septic shock. During the emergency medical assessment hospital staff found Ms. Hendrix had an enormous black, bulging wound to her perineum, lower abdomen, buttocks, and genitals caused by necrotizing fasciitis. Ms. Hendrix died the following morning in the ICU at the hospital. A federal lawsuit related to her death is ongoing.

19.     These prior deaths provided Amason and/or Turn Key with notice that the medical care delivery system at the CCJC is inadequate and exposed people to a substantial risk of serious harm or death.

20.     Despite this knowledge, Turn Key and/or Amason failed to take any reasonable steps to correct the deficiencies in the medical care delivery system at the CCJC.

**B.     JOSEPH IS BOOKED INTO THE CLEVELAND COUNTY JUSTICE CENTER**

21.     Records show that Joseph was booked into the CCJC on or about June 12, 2021. The same records also memorialize a hold from Kingfisher County.

22.     A medical intake form completed with the booking process did not identify any medical problems and Joseph was cleared for general population housing.

**C.     JOSEPH ENCOUNTERS THE CCJC MEDICAL DELIVERY SYSTEM**

23.     On June 13, 2021, records show that Joseph advised a detention officer and Turn Key LPN Angela Albertson that he needed to go to the hospital because his arm had been hurting

since the day of his arrest and because he had an L1 fracture that was hurting.

24.     Records show that other than instructions to "not lay on right side and rest arm," nothing was done for Joseph's medical condition.

25.     Approximately two hours later, Joseph advised Turn Key LVN Sarah Garcia of his back and arm pain.

26.     In response, records show that Joseph was moved to a bottom bunk and placed on a "back pain protocol."

27.     There is no indication that Garcia alerted any medical provider of Joseph's condition, complaints, or her decision-making.

28.     On June 17, 2021, records show that Albertson responded to a sick call placed by Joseph. A copy of Joseph's sick call is not included among the records maintained in Joseph's medical file.

29.     During the encounter, records show that Albertson acknowledged Joseph reporting increased pain and reduced range of motion in his left arm and a belief it might be associated with his back.

30.     Records show that Joseph was scheduled to see a "provider" on June 21st.

31.     On June 19, 2021, records show that Turn Key LPN Amanda Stehr observed Joseph "laying on the . . . floor" in distress with a pain rating of 10/10. She charted that Joseph asked "multiple times" to be transported to the hospital, that he was experiencing the "worst pain he had ever been in and he can not handle it."

32.     In response, records show that Stehr called a nurse practitioner and received an order for 800mg ibuprofen BID. Nothing more was done for Joseph.

33.     On June 21, 2021, records show that Turn Key CRNP Becky Pata was informed that Joseph fractured his L1 approximately three months ago, that he had experienced right shoulder pain since booking, and that he has a history of herniated discs.

34.     Pata also observed Joseph limping and "obviously in a great deal of pain" before charting that she would "send to ER out of abundance of caution."

35.     On June 23, 2021, record show that Pata charted that Joseph was experiencing "pain from back and left ankle." Pata also charted that Joseph was "tearful."

36.     Pata further charted that Joseph had a "wheelchair in his pod" and that he was "[w]earing a back brace." Pata noted that Joseph was able to "raise head to talk" and "raise on one elbow to take meds."

37.     Records show that Pata confirmed Joseph's L1 compression fracture with the emergency room, charted that Joseph was "referred to a specialist," and that Joseph's left ankle was now bruised.

**D.     JOSEPH'S MEDICAL PROVIDERS WARN TURN KEY**

38.     On June 30, 2021, records show that Joseph reported to Pata that he "does not feel well." Joseph was taken to Norman Regional Hospital (NRH) to be evaluated for pneumonia. He was brought directly to medical upon discharge from NRH with discharge "paperwork" from the hospital.

39.     Those discharge instructions provided notice to Turn Key, its staff, and the Cleveland County Sheriff's Office, that Joseph needed to return to the hospital in the event of "worsening symptoms or any symptoms of concern," "trouble breathing," or any "new symptoms or other concerns."

40.     Hospital records document that Joseph presented to the emergency room with complaints of shortness of breath and unilateral leg swelling for the past month.

41.     Upon information and belief, Joseph informed Turn Key of these conditions while at the CCJC.

### E.     JOSEPH'S MEDICAL CONDITION WORSENS

42.     On July 4, 2021, records show that Joseph reported the following worsening or new conditions to Turn Key LPN Natasha Kariuki: (1) chest pain of 10/10; and (2) spitting up blood. Kariuki observed that Joseph appeared to be "mild" distress with "reddish-green mucous . . . in the toilet."

43.     In response to these worsening conditions, Kariuki did nothing other than click a preformatted box suggesting that Kariuki instructed Joseph to "increase fluids, medication use, follow-up sick call if no improvement."

44.     There is no record indicating that Kariuki contacted anyone in response to Joseph's medical needs.

45.     Despite actual knowledge that emergency room physicians instructed Turn Key to bring Joseph to the hospital in the event of worsening or new conditions, Kariuki made no effort to contact any physician or even an R.N.

46.     On July 5, 2021, records show that Joseph reported the following worsening or new conditions to Turn Key LPN Angela Albertson: (1) he was having difficulty breathing; and (2) persistent coughing.

47.     In response to these worsening conditions, Albertson did nothing other than instruct Joseph to "take good deep breaths so as not to get pneumonia."

48.     There is no record indicating that Albertson contacted anyone in response to Joseph's medical needs.

49.     Despite actual knowledge that emergency room physicians instructed Turn Key to bring Joseph to the hospital in the event of worsening or new conditions, there was no effort to contact any physician or even an R.N.

50.     On July 7, 2021, records show that Joseph reported the following worsening or new conditions to Turn Key CRNP Becky Pata: (1) coughing up blood streaked sputum; and (2) heartburn.

51.     In response to these worsening conditions, Pata did nothing other than order omeprazole and prednisone

52.     There is no record indicating that Pata contacted anyone in response to Joseph's medical needs.

53.     Despite actual knowledge that emergency room physicians instructed Turn Key to bring Joseph to the hospital in the event of worsening or new conditions, there was no effort to contact any physician.

54.     On July 14, 2021 at 7:03 p.m., records show that Joseph reported the following worsening or new conditions to Turn Key LPN Christina Meza: (1) "woke up with blood dripping down the side of my face;" (2) pale-looking in appearance; (3) persistent coughing; and (4) "leaning forward to breathe with hands on knees."

55.     In response to these worsening conditions, Meza did nothing other than order Guaifenesin, a generic cough medicine.

56.     There is no record indicating that Meza contacted anyone in response to Joseph's medical needs.

57.    Despite actual knowledge that emergency room physicians instructed Turn Key to bring Joseph to the hospital in the event of worsening or new conditions, there was no effort to contact any physician.

58.    Within an hour of Joseph informing Meza that he woke up with blood dripping down his face, Turn Key and jail staff allowed Joseph's release without disclosing the extent of his medical condition.

**F.    JOSEPH DIES WITHIN A 24 HOURS OF THE CUSTODIAL TRANSFER**

59.    Less than one hour after his encounter with Meza, records show Joseph was released into the custody of a deputy from Kingfisher county at approximately 7:59 p.m.

60.    Upon information and belief, no one at the jail informed the deputy from Kingfisher County of Joseph's deteriorating condition, and no one advised him of the physician orders to bring Joseph back to the emergency department in the event of worsening or new conditions.

61.    Upon information and belief, the failure to advise the Kingfisher deputy of Joseph's serious medical condition was consistent with official policy or practice and how Amason and Turn Key operated the CCJC.

62.    Upon information and belief, the transporting deputy observed that Joseph was in poor condition as he transported him to the Kingfisher jail approximately 60 miles away, but reasonably believed Joseph was medically approved for transport based on the failure of Turn Key or jail staff to tell him otherwise.

63.    Upon arrival at the Kingfisher jail, medical staff refused admission based on Joseph's serious medical condition.

64.    With the medical refusal, the transporting deputy took Joseph to a local hospital before Joseph was transferred to a hospital in Enid where he died the following day, July 15, 2021.

65.     Hospital records document that Joseph's symptoms worsened over the last two weeks while at the CCJC where his deteriorating condition would be obvious to anyone providing adequate supervision.

66.     Hospital records document that Joseph was coughing up large amounts of blood as his condition worsened at the CCJC where his deteriorating condition would be obvious to anyone providing adequate supervision.

67.     Upon information and belief, Joseph informed CCJC staff and Turn Key staff that he was coughing up blood and that his condition was worsening.

68.     Hospital records document that Joseph died with acute bacterial endocarditis, acute respiratory failure, congestive heart failure, and hyponatremia.

69.     Hospital records document that Joseph was also suffering from elevated brain natriuretic peptide (BNP) levels, elevated liver function, elevated INR, normocytic anemia, hemoptysis, acute pulmonary edema, and pleural effusion.

70.     Upon information and belief, Joseph had repeatedly and consistently communicated his deteriorating condition to both jail and Turn Key staff at the CCJC, and despite his efforts to obtain care, Turn Key and CCJC staff failed to take any reasonable steps to address his worsening condition.

## III.

### STATEMENT OF CLAIMS

### CLAIM 1
### NEGLIGENCE
### TURN KEY

71.     Plaintiff adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

72.     A special relationship existed between Turn Key and Joseph arising out of his status as a pretrial detainee. Turn Key owed Joseph a duty of reasonable care in the provision of medical care while Joseph was detained at the CCJC, and Turn Key breached that duty by repeatedly failing to provide adequate care to Joseph consistent with basic correctional medical standards. As a direct and proximate result of Turn Key's failure to provide adequate medical care, Joseph suffered injuries and damages for which Turn Key is liable.

### CLAIM 2
#### NEGLIGENCE
#### KARIUKI, ALBERTSON, PATA, AND MEZA

73.     Plaintiff adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

74.     A special relationship existed between Kariuki, Albertson, Pata, Meza and Joseph arising out of his status as a pretrial detainee. Kariuki, Albertson, Pata, and Meza owed Joseph a duty of reasonable care in the provision of medical care while Joseph was detained at the CCJC, and Kariuki, Albertson, Pata, and Meza breached that duty by repeatedly failing to provide adequate care to Joseph consistent with basic correctional medical standards. As a direct and proximate result of their failure to provide adequate medical care, Joseph suffered injuries and damages for which Kariuki, Albertson, Pata, and Meza are liable.

### CLAIM 3
#### DELIBERATE INDIFFERENCE – POLICY OR PRACTICE
#### INADEQUATE MEDICAL DELIVERY SYSTEM
#### AMASON IN HIS OFFICIAL CAPACITY

75.     Plaintiff adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

76.     As set forth above, Amason adopted, maintained and enforced a written policy or unwritten practice that denied or delayed adequate medical care for Joseph in a manner that

resulted in substantial harm including, without limitation, considerable pain, a worsening of his condition, and death. The specific deficiencies in the medical care delivery system at the CCJC include, without limitation:

a)   Inadequate supervision of chronic care and medically compromised persons;

b)   Failure to adequately document the condition of medically compromised persons over time sufficient to identify material changes;

c)   Failure to provide adequate continuity of care/planning for persons being discharged from the CCJC into the custody of another agency; and

d)   Failure to adequately monitor or supervise operation of the medical delivery system at the CCJC to identify and address deficiencies.

77.   As a result of prior incidents at the CCJC, Amason had actual or constructive notice of these deficiencies and the risk they posed to medically compromised persons.

78.   Assuming Amason denies actual or constructive knowledge, despite multiple prior incidents implicating these deficient policies or practices, a constitutional violation was a highly predictable or plainly obvious consequence of operating a pretrial detention facility with these deficiencies, both individually and collectively, which served as the moving force behind the deprivations suffered by the Plaintiff and for which Amason is liable.

**CLAIM 4**
**DELIBERATE INDIFFERENCE – POLICY OR PRACTICE**
**INADEQUATE TRAINING**
**AMASON IN HIS OFFICIAL CAPACITY**

79.   Plaintiff adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

80.   As set forth above, Amason adopted a policy or practice to delay or deny adequate

medical care to chronic care inmates with objectively serious medical conditions despite knowledge the CCJC accepts arrestees who will develop serious medical conditions that require ongoing care during their detention. Despite that knowledge, Amason did not provide staff with adequate training to identify and document medical emergencies or to elevate care decisions for at-risk people like Joseph.

81.     Amason knew to a moral certainty that CCJC employees would confront situations where a chronic care person they were supervising would experience varying degrees of decline in their objectively serious medical condition up to and including death, and Amason knew supervision of chronic care inmates was dispersed across staff from CCJC and Turn Key such that providing adequate care would present CCJC employees with a difficult choice regarding documentation, supervision, primary responsibility, and initiating care that training or supervision would make less difficult.

82.     Making the wrong choice on such a matter will frequently cause the deprivation of an inmate's constitutional rights.

83.     Despite these considerations, Amason failed to provide adequate training and supervision, and that failure was the moving force behind deprivations suffered by the Plaintiff for which Amason is liable.

## CLAIM 5
### DELIBERATE INDIFFERENCE – POLICY OR PRACTICE
### INADEQUATE MEDICAL DELIVERY SYSTEM
### TURN KEY

84.     Plaintiff adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

85.     As set forth above, Turn Key adopted, maintained, and enforced a written policy or unwritten practice that denied or delayed adequate medical care for Joseph in a manner that

resulted in substantial harm including, without limitation, considerable pain, a worsening of his condition, and death. The specific deficiencies in the medical care delivery system at the CCJC include, without limitation:

      a)    Inadequate supervision of chronic care and medically compromised persons;

      b)    Failure to adequately document the condition of medically compromised persons over time sufficient to identify material changes;

      c)    Failure provide adequate continuity of care/planning for persons being discharged from the CCJC into the custody of another agency; and

      d)    Failure to adequately monitor or supervise operation of the medical delivery system at the CCJC to identify and address deficiencies.

86.    As a result of prior incidents at the CCJC, Turn Key had actual or constructive notice of these deficiencies and the risk they posed to medically compromised persons.

87.    Assuming Turn Key denies actual or constructive knowledge, despite multiple prior incidents implicating these deficient policies or practices, a constitutional violation was a highly predictable or plainly obvious consequence of operating a pretrial detention facility with these deficiencies, both individually and collectively, which served as the moving force behind the deprivations suffered by the Plaintiff and for which Turn Key is liable.

### CLAIM 6
#### DELIBERATE INDIFFERENCE – POLICY OR PRACTICE
#### INADEQUATE TRAINING
#### TURN KEY

88.    Plaintiff adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

89.    As set forth above, Turn Key adopted a policy or practice to delay or deny adequate

medical care to chronic care inmates with objectively serious medical conditions despite knowledge the CCJC accepts arrestees who will develop serious medical conditions that require ongoing care during their detention. Despite that knowledge, Turn Key did not provide staff with adequate training to identify and document medical emergencies or to elevate care decisions for at-risk people like Joseph.

90.     Turn Key knew to a moral certainty that Turn Key staff would confront situations where a chronic care person they were supervising would experience varying degrees of decline in their objectively serious medical condition up to and including death, and Turn Key also knew supervision of chronic care inmates was dispersed across staff from CCJC and Turn Key such that providing adequate care would present Turn Key staff with a difficult choice regarding documentation, supervision, primary responsibility, and initiating care that training or supervision would make less difficult.

91.     Making the wrong choice on such a matter will frequently cause the deprivation of an inmate's constitutional rights.

92.     Despite these considerations, Turn Key failed to provide adequate training, and that failure was the moving force behind deprivations suffered by the Plaintiff for which Turn Key is liable.

## IV.

### RELIEF REQUESTED

93.     Plaintiff respectfully requests all legal and damages available and for the Court to enter judgment against the Defendants and enter such other relief as the Court deems just and equitable, to include, without limitations, an award of compensatory and punitive damages in excess of $75,000.00, along with any other legal or equitable relief to which the Plaintiff is entitled.

Respectfully submitted,

BRYAN & TERRILL

J. Spencer Bryan, OBA # 19419
Steven J. Terrill, OBA # 20869
BRYAN & TERRILL LAW, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73103
Tele/Fax:        (918) 935-2777
sjterrill@bryanterrill.com
*Attorneys for Plaintiff*