# IN THE UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JESSICA STEWART, | ) | |
| as Next Friend of Joseph Stewart, | ) | |
| deceased, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. CIV-23-1046-JD** |
| | ) | |
| TURN KEY HEALTH | ) | |
| CLINICS, LLC, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff, as Next Friend of Joseph Stewart, filed this action seeking relief pursuant to 42 U.S.C. § 1983, claiming violations of Mr. Stewart's constitutional rights. (Doc. 1, at Ex. 2).[1]  United States District Judge Jodi W. Dishman referred the matter to the undersigned Magistrate Judge consistent with 28 U.S.C. § 636(b)(1)(B), (C).  (Doc. 3).

Before the Court is the Motion to Dismiss of Defendants Turn Key, Angela Albertson, Natasha Kariuki, and Christina Meza (Doc. 11), Plaintiff's Response thereto (Doc. 15), and Defendants' Reply (Doc. 17).  As explained fully below, the undersigned recommends that Defendants' Motion to Dismiss (Doc. 11) be **GRANTED in part and DENIED in part.**

---

[1] Citations to a court document are to its electronic case filing designation and pagination. Quotations are verbatim unless indicated.

I.    **Plaintiff's Amended Petition**

Plaintiff's claims stem from the death of her husband, Joseph Stewart, immediately after a custodial transfer from the Cleveland County Justice Center ("CCJC").  (Doc. 1, at Ex. 2, at 19-20).  Plaintiff filed the Amended Petition with the Cleveland County District Court on July 14, 2023.  (*Id.* at Ex. 2, at 1).  Defendant Turn Key removed the action from state court to this Court on November 16, 2023.  (Doc. 1).  In the Amended Petition, (*id.* at Ex. 2), Plaintiff sets forth the following allegations.

A.    **Factual Allegations**

Mr. Stewart was booked into the CCJC on June 12, 2021, and his medical intake form did not identify any medical problems.  (*Id.* at Ex. 2, at 14).

On June 13, 2021, Mr. Stewart reported to Defendant Turn Key Licensed Practical Nurse ("LPN") Angela Albertson that he had arm and back pain, believing the back pain to be related to a previous L1 fracture.  (*Id.* at Ex. 2, at 14-15).  Defendant LPN Albertson told him to rest his arm and not lay on his right side.  (*Id.* at Ex. 2, at 15).  Two hours later, Mr. Stewart notified Turn Key Licensed Vocational Nurse Sarah Garcia of his pain, so she put him on a "back pain protocol" and moved him to a bottom bunk.  (*Id.*)

On June 17, 2021, Defendant LPN Albertson responded to a sick call placed by Mr. Stewart in which he reported increased pain and decreased range of motion in his left arm and reiterated his belief that his back was the root of the cause of the injury.  (*Id.*)  Mr. Stewart was scheduled to see a "provider" on June 21, 2021.  (*Id.*)

On June 19, 2021, Turn Key LPN Amanda Stehr found Mr. Stewart laying on the floor in pain.  (*Id.*)  He stated that his pain was "10/10" and "the worst pain he has ever

been in," and he asked to go to the hospital. (*Id.*) LPN Stehr called a nurse practitioner, who prescribed 800mg of ibuprofen twice per day. (*Id.*)

On June 21, 2021, Defendant Turn Key Certified Registered Nurse Practitioner ("CRNP") Becky Pata was informed that Mr. Stewart fractured his L1 three months prior, had experienced right shoulder pain since booking, and had a history of herniated discs. (*Id.* at Ex. 2, at 16). Because Mr. Stewart was "obviously in a great deal of pain" and limping, Defendant CRNP Pata had Mr. Stewart admitted to the emergency room, where the L1 compression fracture was confirmed. (*Id.*) Two days later, Defendant CRNP Pata charted that Mr. Stewart was "tearful," was wearing a back brace, had a wheelchair in his pod, and experienced pain in his back and left ankle, which was bruised. (*Id.*) She also charted that he could "raise his head to talk and raise on one elbow to take meds" and that he was referred to a specialist. (*Id.*)

On June 30, 2021, after reporting to Defendant CRNP Pata that he did not feel well, Mr. Stewart was taken to Norman Regional Hospital to be evaluated for pneumonia. (*Id.*) Hospital records showed that Mr. Stewart complained of shortness of breath and month-long swelling in his leg. (*Id.* at Ex. 2, at 17). Mr. Stewart's discharge paperwork stated that he needed to return to the hospital if he had "worsening symptoms or any symptoms of concern, trouble breathing, or any new symptoms or other concerns." (*Id.* at Ex. 2, at 16) (internal quotation marks omitted).

On July 4, 2021, Mr. Stewart reported to Defendant Turn Key LPN Natasha Kariuki that he had "chest pain of 10/10" and was spitting up blood. (*Id.* at Ex. 2, at 17). Defendant LPN Kariuki noticed "reddish-green mucous" in the toilet and "click[ed] a preformatted

box suggesting that Kariuki instructed Mr. Stewart to 'increase fluids, medication use, follow-up sick call if no improvement.'" (*Id.*)

On July 5, 2021, Mr. Stewart reported to Defendant LPN Albertson that he had difficulty breathing and was persistently coughing. (*Id.*) Defendant LPN Albertson instructed Mr. Stewart to "take good deep breaths so as not to get pneumonia." (*Id.*)

On July 7, 2021, Mr. Stewart reported to Defendant CRNP Pata that he was coughing up "blood[-]streaked sputum" and had heartburn. (*Id.* at Ex. 2, at 18). Defendant CRNP Pata ordered omeprazole and prednisone. (*Id.*)

On July 14, 2021, at 7:03 p.m., Mr. Stewart told Defendant Turn Key LPN Christina Meza that he "woke up with blood dripping down the side of [his] face," and he was pale in appearance, had a persistent cough, and had to lean forward to breathe. (*Id.*) In response, Defendant LPN Meza ordered a generic cough medicine. (*Id.*)

At approximately 7:59 p.m. the same day, Mr. Stewart was released into the custody of a Kingfisher County deputy, who was not informed of Mr. Stewart's condition or the physician's orders to return him to the hospital if his condition worsened. (*Id.* at Ex. 2, at 19). The Kingfisher County Jail medial staff refused to complete intake of Mr. Stewart because of his medical condition, so the deputy transported Mr. Stewart to a local hospital, and he was then transferred to a hospital in Enid. (*Id.*)

On July 15, 2021, Mr. Stewart died at the hospital in Enid with "bacterial endocarditis, acute respiratory failure, congestive heart failure, and hyponatremia." (*Id.* at Ex. 2, at 20). Records also show Mr. Stewart suffered from "elevated brain natriuretic

peptide (BNP) levels, elevated liver function, elevated INR, normocytic anemia, hemoptysis, acute pulmonary edema, and pleural effusion." (*Id.*)

### B.    Legal Claims

Against Defendant Turn Key, Plaintiff asserts that (1) Defendant Turn Key was negligent under state law for failing to provide adequate medical care, (*id.* at Ex. 2, at 20-21 (Claim 1)); (2) Defendant Turn Key's policy and/or practice of maintaining a deficient medical care delivery system caused the violation of Mr. Stewart's constitutional right to adequate medical care, (*id.* at Ex. 2, at 23-24 (Claim 5)); and (3) Defendant Turn Key's failure to train its staff caused the violation of Mr. Stewart's constitutional right to adequate medical care, (*id.* at Ex. 2, at 24-25 (Claim 6)).  Against Defendants Kariuki, Albertson, Pata, and Meza ("the LPN Defendants"), Plaintiff asserts a state law claim of negligence for failing to provide adequate medical care.  (*Id.* at Ex. 2, at 21 (Claim 2)).

In the Motion to Dismiss filed by Defendant Turn Key and the LPN Defendants, the Defendants argue that the Amended Complaint should be dismissed in its entirety for failure to state proper claims under federal or state law.  (Doc. 11, at 12-13, 30-39). Defendant Turn Key argues that Plaintiff has failed to sufficiently allege facts demonstrating a violation of Mr. Stewart's Eighth Amendment right to adequate medical care and has also failed to adequately allege municipal liability. (*Id.* at 13-30).  Defendant Turn Key and the LPN Defendants argue that they are immune from state law tort claims under the Oklahoma Governmental Tort Claims Act.  (*Id.* at 30-37).  Alternatively, they argue that the statute of limitations bars Plaintiff's state law negligence claims. (*Id.* at 37-39).

## II.    Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  (citing *Twombly*, 550 U.S. at 556); *see also Gee v. Pacheco*, 627 F.3d 1178, 1184 (10th Cir. 2010).  In applying this standard, the court must "accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[, and t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## III.    Plaintiff's *Monell* Claims Against Defendant Turn Key

Section 1983 "creates a private right of action against any person who, under color of state law, deprives another individual of 'any rights, privileges or immunities secured by the Constitution and laws.'" *Ripley v. Wyo. Med. Ctr., Inc.*, 559 F.3d 1119, 1121-22 (10th Cir. 2009) (quoting 42 U.S.C. § 1983).  A private entity acting under color of state law may be held liable for constitutional violations under § 1983.  *Dubbs v. Head Start, Inc.*, 3363 F.3d 1194, 1216 (10th Cir. 2003).  As a provider of medical services at correctional facilities, including the CCJC, Defendant Turn Key is subject to § 1983 liability under the doctrine of municipal liability set forth in *Monell v. Dep't of Soc.*

6

*Services*, 436 U.S. 658 (1978). *Id.* ("Although the Supreme Court's interpretation of §

1983 in *Monell* applied to municipal governments and not to private entities acting under

color of state law, caselaw from this and other circuits has extended the *Monell* doctrine to

private § 1983 defendants."); *see, e.g.*, *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th

1127 (10th Cir. 2023) (resolving a municipal liability claim against Turn Key).

    Under the *Monell* doctrine, Defendant Turn Key cannot be held vicariously liable

for its employees' alleged constitutional violations under § 1983. *See Schneider v. City of

Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). Instead, to establish

Defendant Turn Key's liability under § 1983, Plaintiff must establish three basic elements:

(1) Defendant Turn Key had an official policy or custom; (2) that "was enacted or

maintained with deliberate indifference to an almost inevitable" federal rights violation;

and (3) that caused a violation of Plaintiff's federal rights. *Id*. at 769-71.

    The Tenth Circuit has articulated that a municipal policy or custom may take one of

five forms:

> (1) a formal regulation or policy statement; (2) an informal custom
> amounting to a widespread practice that, although not authorized by written
> law or express municipal policy, is so permanent and well settled as to
> constitute a custom or usage with the force of law; (3) the decisions of
> employees with final policymaking authority; (4) the ratification by such
> final policymakers of the decisions — and the basis for them — of
> subordinates to whom authority was delegated subject to these policymakers'
> review and approval; or (5) the failure to adequately train or supervise
> employees, so long as that failure results from deliberate indifference to the
> injuries that may be caused.

*Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Bryson*

*v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)).

Here, Plaintiff alleges municipal liability through a policy and custom and through a failure to train staff.

### A.    Plaintiff Has Plausibly Alleged Defendant Turn Key's Municipal Liability Under the Systemic Failure Doctrine (Claim 5).

#### 1.    Existence of Policy and Custom

In Claim 5, Plaintiff alleges that "Turn Key adopted, maintained, and enforced a written policy or unwritten practice that denied or delayed adequate medical care for Joseph." (Doc. 1, at Ex. 2, at 23). More specifically, Plaintiff alleges that Defendant Turn Key "maintained a custom, practice, and policy at the CCJC of disregarding or minimizing people's medical complaints to save money and increase profits through rationing care, understaffing, and/or using staff to recklessly practice medicine outside their scope." (*Id.* at Ex. 2, at 3-4). Plaintiff alleges that the CCJC's contract with Defendant Turn Key limits Defendant Turn Key's expenditures on offsite and specialty care costs to $50,000 per year while limiting its medication expenditures to $40,000 per year, "despite [Defendant Turn Key's] understanding there would be, on average, approximately 350 detainees in their care." (*Id.* at Ex. 2, at 4). Plaintiff states that Turn Key's medical delivery system exhibits the following deficiencies:

a)    Inadequate supervision of chronic care and medically compromised persons;

b)    Failure to adequately document the condition of medically compromised persons over time sufficient to identify material changes;

c)    Failure [to] provide adequate continuity of care/planning for persons being discharged from the CCJC into the custody of another agency; and

d)    Failure to adequately monitor or supervise operation of the medical delivery system at the CCJC to identify and address deficiencies.

(*Id.* at Ex. 2, at 24).

"In attempting to prove the existence of [] a continuing, persistent and widespread custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008). In support of Plaintiff's allegations that Defendant Turn Key's medical delivery system is inadequate, Plaintiff summarized eighteen other incidents in which Defendant Turn Key allegedly denied or delayed medical care. (*Id.* at Ex. 2, at 4-14). Three of the incidences occurred at the CCJC, while the others occurred at various jails across Oklahoma and Arkansas. (*Id.*) Notable examples include the following:

- In 2009, CCJC detainee who suffered a traumatic brain injury was placed in a holding cell for three days without medical attention, later suffering a heart attack and entering into a coma before passing away. (*Id.* at Ex. 2, at 4).

- In 2011, a CCJC detainee died of a heart attack after telling medical staff that "he had high blood pressure and was in severe pain." A nurse told him that he was faking his condition while he was "doubled over and clutching his chest." (*Id.* at Ex. 2, at 4-5).

- In 2016, a Muskogee County Jail inmate who had been in a car accident "became quadriplegic one limb at a time" due to a cervical epidural abscess. Turn Key staff did not address the inmate's symptoms for eleven days, after which they found him lying in a puddle of his own urine and complaining of 10/10 pain. Staff then sent him to the hospital, but he "remained paralyzed and permanently disabled despite spinal surgery." (*Id.* at Ex. 2, at 7-8).

- In 2016, a Canadian County Detention Center inmate screamed in pain and pled for assistance for days while experiencing symptoms "including black foul-smelling feces that had the appearance of coffee grounds," but Turn Key staff did not assess him. The inmate died after being found "naked, unconscious, and covered in his own waste in a cell." (*Id.* at Ex. 2, at 6).

- In 2017, a Pulaski County Regional Detention Facility inmate died from acute pneumonia, never having been assessed by "a higher-level caregiver or transported to the hospital." Turn Key staff had noticed that she was disoriented, noncommunicative, and not eating or drinking for two weeks. Her blood pressure was "critically low" in the few days prior to death and blood labs indicated a "life-threatening condition." (*Id.* at Ex. 2, at 8).

- In 2020, a Canadian County Detention Center detainee[2] who suffered from a rash, nausea, vomiting, severe pain, and dizziness was denied a medical evaluation by Turn Key staff.  She became incoherent and erratic and complained that "she felt like she was dying."  When she collapsed, she was transported to a hospital, where hospital staff observed an "enormous black, bulging wound to her perineum, lower abdomen, buttocks, and genitals caused by necrotizing fasciitis."  The detainee died the next day.  (*Id.* at Ex. 2, at 13-14).

In its Motion to Dismiss, Defendant Turn Key argues that Plaintiff has not demonstrated a pattern or practice of inadequate supervision and denying or delaying adequate medical care because incidences at other facilities are "peripheral and inconsequential to prove the policies or customs that were present at CCJC in 2021." (Doc. 11, at 24).  Citing *Bailey v. Turn Key Health Clinics, LLC,* 2021 WL 4256086 (N.D. Okla. Sept. 17, 2021), Plaintiff argues that "[i]nadequate responses across multiple facilities, in a variety of locations, supports the existence of a widespread custom or practice." (Doc. 15, at 16).  In *Bailey*, the United States District Court for the Northern District of Oklahoma

---

[2] Plaintiff does not state where this particular inmate was detained.  However, the Court takes judicial notice that this inmate was detained at the Canadian County Detention Center, as detailed in *Yelton v. Bd. of Cnty. Comm'rs*, No. CIV-21-1001-G, at Doc. 26 (W.D. Okla.).  *See Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000) ("We note, however, that the court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001); *United States v. Ahidley*, 486 F.3d 1184. 1192 n.5 (10th Cir. 2007) (". . . we may exercise our discretion to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand.").

("the Northern District Court") found that the plaintiff had adequately pled a Turn Key custom or policy when the plaintiff "cite[d] numerous instances at other prison medical facilities operated by Turn Key in which medical care was inadequate or denied altogether" pursuant to a cost-cutting policy or custom. *Bailey*, 2021 WL 4256086, at *6. The undersigned agrees with Plaintiff and the Northern District Court.

Taking Plaintiff's allegations as true, the individuals in the examples provided were all county inmates in urgent need of medical care in institutions that contracted with Turn Key for medical services. That these individuals were at different institutions means that they were not identically situated, but it does not negate that they were similarly situated. *See Bailey*, 2021 WL 4256086, at *6; *cf. Ashaheed v. Currington*, 7 F.4th 1236, 1251 (10th Cir. 2021) ("In the equal protection context, a person is similarly situated to others if they are alike in 'all relevant respects'—not all respects."). Furthermore, the similar incidences of mistreatment are alleged against the same municipal defendant—Defendant Turn Key. Defendant Turn Key provides no authority supporting the argument that a custom cannot be established when a municipal defendant engages in similar behavior across various locations of operation. Thus, the different-institution argument fails.

Defendant Turn Key also argues that the examples of similar incidences are too old to be indicative of a custom but cites no legal authority. (Doc. 11, at 24). Given that fifteen of the examples provided by Plaintiff have occurred since 2016—only five years before Mr. Stewart's death—and courts have frequently determined that evidence of behavior occurring within the past five years or longer may sufficiently establish the existence of a pattern or practice, Defendant Turn Key's inadequate-timeframe argument fails. *See, e.g.,*

*Quintana v. Sante Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020) (finding custom adequately alleged when evidence of pattern or practice spanned at least thirteen years); *Pendleton v. Bd. of Cnty. Comm'rs*, No. CIV-18-707-G, 2019 WL 4752269, at *10 (W.D. Okla. Sept. 30, 2019) (twenty years); *Ashby v. Campbell Cnty.*, 2007 WL 9706244, at *6 (D. Wyo. May 2, 2007) (five years); *Murphy v. Sandoval Cnty.*, 2019 WL 8881629, at *6 (D.N.M. Feb. 11, 2019) (ten years).

Lastly, Defendant Turn Key argues that it cannot be held responsible for failing to follow CCJC's written policies.  (Doc. 11, at 23).  Plaintiff's Amended Petition clearly contains allegations regarding Defendant Turn Key's own policies and practices. (*See* Doc. 1, at Ex. 2, at 3-4, 23-24).  Thus, this argument fails.

Plaintiff's allegations regarding the numerous experiences of other critically ill inmates at jails that contracted with Defendant Turn Key plausibly allege that Defendant Turn Key operates a deficient medical delivery system that includes inadequate supervision of critically ill inmates, minimizing medical needs, and understaffing or allowing staff to recklessly practice medicine outside their scope.  Thus, Plaintiff has sufficiently alleged the existence of a policy or custom.  *See Brothers v. Bd. of Cnty. Comm'rs*, No. CIV-21-418-SLP, 2023 WL 4041854, at *10 (W.D. Okla. June 15, 2023) (systemic failures within a jail's medical operation may constitute a policy or custom for *Monell* purposes).

### 2.    Deliberate Indifference

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk

of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).  "In most instances, notice can be established by proving the existence of a pattern of tortious conduct."  *Id.* Plaintiff states that the "prior deaths [at other jails that contracted with Turn Key] provided Amason and/or Turn Key with notice that the medical care delivery system at the CCJC is inadequate and exposed people to a substantial risk of serious harm or death."  (Doc. 1, at Ex. 2, at 14).

Given the numerous examples Plaintiff provided of inmates who died or became permanently disabled while under the care of Defendant Turn Key, typically without having timely seen a physician or without having been consistently supervised and assessed, (*see id.*, at Ex. 2, at 4-14), Plaintiff has adequately alleged that Defendant Turn Key had notice that its medical delivery system was substantially likely to cause constitutional harm.  *See Barney*, 143 F.3d at 1307; *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1050-51 (10th Cir. 2022) (finding deliberate indifference where "three other [jail] inmates died in the three years prior to [the inmate's] death after seemingly receiving inadequate medical attention"); *Brothers*, 2023 WL 4041854, at *10 (finding deliberate indifference where, *inter alia*, the plaintiff "point[ed] to a significant number of inmate deaths at the Jail and evidence from which to draw a reasonable inference that those deaths resulted from [systemic] deficiencies").

### 3.     Constitutional Violation

"Because municipalities act through officers, ordinarily there will be a municipal violation only where an individual officer commits a constitutional violation."  *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1191 (10th Cir. 2020).  However, a municipality may

also be liable "[w]here the sum of multiple officers' actions taken pursuant to municipal policy results in a constitutional violation." *Id.*; *see also Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 310 (10th Cir. 1985) ("Although the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights."). In other words, "when a municipal-liability claim is premised on the municipality's 'systemic failure[s],' no single individual defendant need be found liable." *Johnson v. Davis Cnty.*, No. CIV-21-4030, 2022 WL 830202, at *3 (10th Cir. Mar. 21, 2022) (citing *Crowson*, 983 F.3d at 1192).

Here, Plaintiff alleges that Defendant Turn Key is liable for deliberate indifference to Mr. Stewart's serious medical needs in violation of the Eighth Amendment, which prohibits cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *see also Lance v. Morris*, 985 F.3d 787, 793 (10th Cir. 2021) ("The Fourteenth Amendment's Due Process Clause entitles pretrial detainees to the same standard of medical care that the Eighth Amendment requires of convicted inmates."). For an inmate to state a cognizable claim for inadequate medical attention under the Eighth Amendment, the inmate must satisfy both an objective and subjective prong. *Strain v. Regalado*, 977 F.3d 984, 989-90 (10th Cir. 2020). Defendant Turn Key does not dispute that Mr. Stewart's death satisfies the objective prong of the analysis, (Doc. 11, at 15), which looks to the nature and severity of the medical condition. *Strain*, 977 F.3d at 989-90. However, Defendant Turn Key disputes that Plaintiff has satisfied the subjective prong in any way.

Typically, to satisfy the subjective component of the deliberate indifference standard, the Plaintiff must demonstrate that a prison official "[knew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both [have been] aware of facts from which the inference could [have been] drawn that a substantial risk of serious harm exist[ed], and [s]he must also [have drawn] the inference." *Id.* at 990 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Defendant Turn Key contends that Plaintiff has not established the subjective component through an individual officer's commission of a constitutional violation. (Doc. 11, at 25). The undersigned agrees, as Plaintiff has not alleged that any specific officer of Defendant Turn Key was deliberately indifferent to Mr. Stewart's serious medical condition. *See infra* III.B. Allegations of negligence do not suffice. *Farmer*, 511 U.S. at 835.

Defendant Turn Key also contends that Plaintiff has not adequately alleged municipal liability through the systemic failure doctrine of *Crowson* and *Garcia*. (Doc. 11, at 25-30). The undersigned disagrees. "Deliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia*, 768 F.2d at 308. As discussed above, the undersigned has determined that Plaintiff has plausibly alleged that Defendant Turn Key has a policy or custom of operating an inadequate medical delivery system and was deliberately indifferent in adopting and maintaining the policies and practices that underly that system. *See supra* III.A.1, III.A.2. Taking Plaintiff's allegations as true, the gross deficiencies in Defendant Turn Key's medical delivery system  deprived Mr. Stewart of adequate medical care. Thus, Plaintiff

15

has established both the subjective and objective components of her Eighth Amendment claim.

### 4.    Causation

Lastly, Defendant Turn Key argues that Plaintiff has not adequately alleged that its policies or customs caused Mr. Stewart constitutional harm because no systemic deficiencies existed "during the pertinent window of time." (Doc. 11, at 28-29). In support, Defendant Turn Key points to the intake and assessments performed by various nurses, the prescriptions and equipment provided to Mr. Stewart, and the transfers to outside medical facilities. (*Id.* at 29).

The undersigned disagrees, finding that Plaintiff has adequately alleged causation. Plaintiff alleges that Turn Key staff failed to have Mr. Stewart assessed by a physician or transferred to a hospital from July 4, 2021, to July 14, 2021, despite his worsening symptoms, which included coughing up blood, chest pain, and trouble breathing. (Doc. 1, at Ex. 2, at 17-19). That Turn Key staff had previously taken Mr. Stewart to the hospital does not negate their failure to take him to the hospital or have him assessed by a physician during this ten-day period. Plaintiff also alleges that on the day of Mr. Stewart's attempted transfer to Kingfisher County, "no one at the jail informed the deputy from Kingfisher County of [Mr. Stewart's] deteriorating condition." (*Id.* at Ex. 2, at 19). These allegations are consistent with Defendant Turn Key's alleged policies and practices of inadequately supervising and documenting medical issues, rationing care and minimizing complaints to cut costs, and using staff to "recklessly practice medicine outside their scope." (*Id.* at Ex. 2, at 3-4, 23-24). Therefore, Plaintiff has adequately alleged causation. *See Burke v.*

*Regalado*, 935 F.3d 960, 1000 (10th Cir. 2019) (finding causation satisfied when the events leading to the constitutional deprivation "were consistent with the chronic deficiencies [in the jail] identified above"); *Brothers*, 2023 WL 4041854, at *10 ("The nature of the historic deficiencies and failures at the Jail correspond to the deficiencies and failures which occurred in relation to [the decedent's] monitoring and medical care.").

At the motion to dismiss stage, Plaintiff has plausibly alleged a *Monell* claim against Defendant Turn Key based on the systemic failure doctrine. *See Quintana*, 973 F.3d at 1034 ("So we conclude—given . . . the low bar for surviving a motion to dismiss—the plaintiffs alleged enough to explore their *Monell* claim in the discovery process.").

### B.    Plaintiff Has Failed To Plausibly Allege Defendant Turn Key's Municipal Liability Based on a Failure To Train (Claim 6).

In Claim 6, Plaintiff also alleges a *Monell* claim against Defendant Turn Key based on a failure to adequately train staff "to identify and document medical emergencies or to elevate care decisions for at-risk people like [Mr. Stewart]."  (Doc. 1, at Ex. 2, at 25). Defendant Turn Key argues that Plaintiff's failure-to-train claim fails because she has not alleged that any individual Turn Key officer exhibited deliberate indifference to Mr. Stewart's serious medical needs.  (Doc. 11, at 25).  In response, Plaintiff argues, "[t]here is no requirement compelling a plaintiff to allege § 1983 claims against an individual as a prerequisite to establishing entity liability for failure to train (or anything else).  If the facts support individual liability under § 1983, nothing more is required to establish entity liability for failure to train."  (Doc. 15, at 17).

Plaintiff is correct that a plaintiff need not allege a § 1983 claim against an individual officer to impose liability on a municipality for failing to train its employees. However, a plaintiff still must allege that an individual officer's conduct directly caused constitutional injury. *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1156 (10th Cir. 2001) ("In sum, we hold that absent a constitutional violation by the individual police officers whose conduct directly caused plaintiffs' injuries, there can be no municipal liability imposed on the City of Tulsa . . . ."); *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998) ("[T]he plaintiffs' failure to train claims . . . require[] a predicate showing that the officers did in fact use excessive force against [the decedent]."). "A failure-to-train claim may not be maintained without a showing of a constitutional violation by the allegedly un-, under-, or improperly-trained officer." *Crowson*, 983 F.3d at 1187. Thus, the systemic failure doctrine does not apply to failure-to-train claims. *See id.*

Plaintiff makes various factual allegations regarding the inadequate actions of the LPN Defendants and Defendant Pata despite knowledge of Mr. Stewart's worsening condition and the obviousness of his symptoms. (Doc. 1, at Ex. 2, at 17-20). However, Plaintiff does not clearly allege that particular conduct performed by a particular untrained nurse violated Mr. Stewart's Eighth Amendment rights. Since Plaintiff is represented by counsel, the undersigned may not liberally construe her Complaint. *See Healey v. Scovone*, 188 F.3d 518, at *1 n.1 (10th Cir. 1999) (unpublished table opinion); *Shepherd v. RSM Dev., Inc.*, No. CIV-19-129-R, 2019 WL 2167422, at *2 (W.D. Okla. May 17, 2019). Plaintiff's failure to adequately allege the underlying constitutional violation is detrimental

18

to her failure-to-train claim. Therefore, Plaintiff's *Monell* claim based on inadequate training should be dismissed.

**IV. The Court Should Decline To Exercise Supplemental Jurisdiction Over Plaintiff's State Law Negligence Claims Against Defendant Turn Key (Claim 1) and the LPN Defendants (Claim 2) Because the Law Is Unsettled.**

Defendant Turn Key and the LPN Defendants request dismissal of Plaintiff's state law claims because they contend they are immune from liability under the Oklahoma Governmental Tort Claims Act ("OGTCA"). (Doc. 11, at 30-37). However, Oklahoma law is unsettled as to whether a private contractor that provides medical services to inmates and its employees are immune from suit under the OGTCA.

The OGTCA provides that "[t]he state, its political subdivisions, and all of their employees acting within the scope of their employment . . . shall be immune from liability for torts." Okla. Stat. tit. 51, § 152.1(A). As defined in the OGTCA, a "tort" is "a legal wrong, independent of contract, involving violation of a duty imposed by general law, statute, the Constitution of the State of Oklahoma, or otherwise, resulting in a loss to any person . . . as the proximate result of an act or omission of a political subdivision or the state or an employee acting within the scope of employment." Okla. Stat. tit. 51, § 152(14); *see also Barrios v. Haskell Cnty. Pub. Facilities Auth*., 432 P.3d 233, 238 (Okla. 2018) (explaining that the Oklahoma Legislature amended the OGTCA in 2014 "to specify that the State's immunity from suit extended even to torts arising from alleged deprivations of constitutional rights").

It is specifically provided that "[t]he state or a political subdivision shall not be liable if a loss or claim results from . . . [p]rovision, equipping, operation or maintenance

of any prison, jail or correctional facility." Okla. Stat. tit. 51, § 155(25). The Oklahoma

Supreme Court has explained that the state and its political subdivisions cannot be held

liable

> for any loss or injury, whether to an inmate or other person, resulting from
> the operational level acts required to furnish the services of a penal
> institution, including . . . the food, clothing, items for hygiene and other basic
> personal items needed by inmates or other persons; the educational,
> rehabilitative, communicational, recreational and medical and health
> services or any other service provided for inmates or other persons . . . ."

*Medina v. State*, 871 P.2d 1379, 1384 n.13 (Okla. 1993).

The Tenth Circuit has previously held that it is premature for a federal district court

to determine whether a private corporation contracting to provide medical services to

inmates, such as Defendant Turn Key, and its employees are immune from tort liability as

state or political subdivision "employees" under the OGTCA at the motion to dismiss stage.

*Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th at 1148. The *Lucas* court stated that

"without further guidance from the Oklahoma courts," it is appropriate to determine the

immunity issue "at the summary judgment stage if the factual record is sufficiently

developed and the facts are uncontroverted." *Id.*; *see also Bond v. Regalado*, No. CIV-22-

5065, 2023 WL 7014047, at *3 (10th Cir. Oct. 25, 2023*) (finding it premature to grant

immunity to healthcare contractor and its employees at the motion to dismiss stage).

Since *Lucas*, the Oklahoma Court of Civil Appeals ("COCA") has decided two

relevant cases with conflicting holdings. On February 27, 2024, the COCA affirmed a trial

court's determination that Armor Correctional Health Services, Inc. ("Armor"), a private

contractor that provides medical services to Oklahoma County Jail inmates, is immune

20

under the OGTCA from torts arising from its provision of services. *Martin v. Bd. of Cnty. Comm'rs*, COCA Case No. 120,422, at 8-9 (Okla. Civ. App. Feb. 27, 2024). The *Martin* court explained that Armor was an "employee" covered by OGTCA immunity since the OGTCA extended immunity to "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies." *Id.* (quoting Okla. Stat. tit. 51, § 152(7)(b)(7)). The *Martin* court also relied on Oklahoma Supreme Court case *Barrios v. Haskell County Public Facilities Authority*, in which the court considered whether the OGTCA protects State entities from constitutional torts. 432 P.3d 233. The *Martin* court quoted a *Barrios* footnote that stated, "generally speaking, the staff of a healthcare contractor at a jail are 'employees' who are entitled to tort immunity under the GTCA by virtue of sections 152(7)(b), 153(A), and 155(25)." *Martin*, No. 120,422, at 9 (quoting *Barrios*, 432 P.3d at 236 n.5).

Conversely, on March 1, 2024, the COCA held in another case that "private corporate entities that contract with the state or a political subdivision to provide medical care to inmates or detainees of law enforcement agencies are not employees under title 51 O.S. § 152(b)(7) and are not immune from liability for their torts under the Oklahoma Governmental Tort Claims Act." *Estate of Sanders v. Turn Key Health Clinics, LLC*, COCA Case No. 121,589, at 2 (Okla. Civ. App. March 1, 2024). The COCA explained that while the OGTCA grants immunity to "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees," Okla. Stat. tit. 51, § 152(7)(b)(7), this immunity only extends to licensed *individuals*, not private

corporate entities such as Turn Key. *Estate of Sanders*, No. 121,589, at 7-8. The *Sanders* court also cited *Barrios*, noting that the *Barrios* court stated in a footnote, "[w]e have not been asked whether Turn Key Health, LLC or its staff are 'employees' under section 152(7)(b), but have assumed they are for purposes of answering the questions certified to us." *Id.* at 6 (quoting *Barrios*, 432 P.3d at 236 n.5). The *Sanders* court explained that "[t]he assumption in *Barrios* is not precedent." *Id.* at 6. On June 3, 2024, the Oklahoma Supreme Court granted a petition for writ of certiorari in which Turn Key asked the court to resolve the COCA split regarding the immunity issue. *Estate of Sanders*, No. 121,589.[3]

In light of the disagreement within the COCA on whether private entities that contract to provide medical care to inmates are entitled to tort immunity under the OGTCA, along with the pending appeal in *Sanders*, the undersigned recommends that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law negligence claims against Defendant Turn Key and the LPN Defendants. *See RX Med. LLC v. Melton*, No. CIV-22-731-PRW, 2022 WL 4000712, at *3 (W.D. Okla. Sept. 1, 2022) (declining supplemental jurisdiction over state law issues "revolving around the interpretation of an important state statute" and "over which the parties suggest that panels of the state's intermediate appellate court may disagree"). Because the undersigned recommends the Court decline to exercise jurisdiction over the state law negligence claims, and because the statute of limitations argument depends on whether the OGTCA applies to the Defendants,

---

[3] https://www.oscn.net/dockets/GetCaseInformation.aspx?db=appellate&number=121589 (*Docket Sheet*) (last visited August 22, 2024).

the undersigned does not address the statute of limitations argument, (*see* Doc. 11, at 37-39).

## V.    Request for Leave to Amend or for Pre-Answer Discovery

In Plaintiff's Response to the Defendant Turn Key's and the LPN Defendants' Motion to Dismiss, Plaintiff requests the Court grant leave to amend the Amended Complaint to address any deficiencies identified by the Court, or in the alternative, to order limited pre-answer discovery.  (Doc. 15, at 19).  At this time, the undersigned **denies** both of these requests.  Plaintiff may object to this Report and Recommendation to the extent she disagrees with the undersigned's conclusions.  28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Furthermore, to request leave to amend, Plaintiff must submit a separate motion with the proposed amendment attached as an exhibit, per the local rules. LCvR7.1(c); LCvR15.1.

## VI.    Defendant CRNP Pata

Defendant Turn Key and the LPN Defendants state in their Motion to Dismiss that Plaintiff has not properly served Defendant CRNP Pata and that the Motion to Dismiss should not[4] be construed as a submission to personal jurisdiction or as filed on her behalf. (Doc. 11, at 7 n.1).  Plaintiff has not demonstrated that Defendant CRNP Pata was in fact

---

[4] Defendants state that "[t]his motion is to be construed as a submission to personal jurisdiction."  (Doc. 11, at 7 n.1). However, considering Defendants' statement that the Motion to Dismiss is not filed on Defendant CRNP Pata's behalf and that "her constitutional right of due process has not yet been satisfied," (*id.*), the undersigned construes the former statement as an error and understands that the motion is *not* to be construed as a submission to personal jurisdiction.

properly served.  Nevertheless, since the undersigned recommends dismissal of the only claim alleged against Defendant CRNP Pata (Claim 2), the service issue is moot.

## VII.    Recommended Ruling and Notice of Right to Object

For the reasons discussed above, the undersigned recommends that the Court **GRANT in part and DENY in part** Defendant Turn Key's and the LPN Defendants' Motion to Dismiss (Doc. 11).  Plaintiff's systemic failure *Monell* claim against Defendant Turn Key (Claim 5) remains.

**The undersigned advises the parties of their right to file an objection to this Report and Recommendation with the Clerk of Court on or before September 5, 2024,** under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  The undersigned further advises the parties that failure to file a timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal issues contained herein.  *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation does not terminate the referral in this matter.

ENTERED this 22nd day of August, 2024.

AMANDA MAXFIELD GREEN
UNITED STATES MAGISTRATE JUDGE