IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JESSICA STEWART, ) <br> as Next Friend of Joseph Stewart, ) <br> deceased, ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> TURN KEY HEALTH ) <br> CLINICS, LLC, et al., ) <br> ) <br>     Defendants. ) | Case No. CIV-23-1046-JD |

## REPORT AND RECOMMENDATION

Plaintiff, as Next Friend of Joseph Stewart, filed this action seeking relief pursuant to 42 U.S.C. § 1983, claiming violations of Mr. Stewart's constitutional rights. (Doc. 1, at Ex. 2).[1] United States District Judge Jodi W. Dishman referred the matter to the undersigned Magistrate Judge consistent with 28 U.S.C. § 636(b)(1)(B), (C). (Doc. 3).

Before the Court is Defendant Chris Amason's Motion to Dismiss the Amended Complaint (Doc. 10), Plaintiff's Response thereto (Doc. 14), and Defendant Amason's Reply (Doc. 19). **As fully explained below, the undersigned recommends that the Court GRANT Defendant's Amason's Motion (Doc. 10).**

---

[1] Citations to a court document are to its electronic case filing designation and pagination. Quotations are verbatim unless indicated.

I.  **Plaintiff's Amended Petition**

Plaintiff's claims stem from the death of her husband, Joseph Stewart, immediately after a custodial transfer from the Cleveland County Justice Center ("CCJC"). (Doc. 1, at Ex. 2, at 19-20). Plaintiff filed the Amended Petition with the Cleveland County District Court on July 14, 2023. (*Id.* at Ex. 2, at 1). Defendant Turn Key removed the action from state court to this Court on November 16, 2023. (Doc. 1). In the Amended Petition, (*id.* at Ex. 2), Plaintiff sets forth the following allegations.

A.  **Factual Allegations**

Mr. Stewart was booked into the CCJC on June 12, 2021, and his medical intake form did not identify any medical problems. (*Id.* at Ex. 2, at 14).

On June 13, 2021, Mr. Stewart reported to Defendant Turn Key Licensed Practical Nurse ("LPN") Angela Albertson that he had arm and back pain, believing the back pain to be related to a previous L1 fracture. (*Id.* at Ex. 2, at 14-15). Defendant LPN Albertson told him to rest his arm and not lay on his right side. (*Id.* at Ex. 2, at 15). Two hours later, Mr. Stewart notified Turn Key Licensed Vocational Nurse Sarah Garcia of his pain, so she put him on a "back pain protocol" and moved him to a bottom bunk. (*Id.*)

On June 17, 2021, Defendant LPN Albertson responded to a sick call placed by Mr. Stewart in which he reported increased pain and decreased range of motion in his left arm and reiterated his belief that his back was the root of the cause of the injury. (*Id.*) Mr. Stewart was scheduled to see a "provider" on June 21, 2021. (*Id.*)

On June 19, 2021, Turn Key LPN Amanda Stehr found Mr. Stewart laying on the floor in pain. (*Id.*) He stated that his pain was "10/10" and "the worst pain he has ever

been in," and he asked to go to the hospital. (*Id.*) LPN Stehr called a nurse practitioner, who prescribed 800mg of ibuprofen twice per day. (*Id.*)

On June 21, 2021, Defendant Turn Key Certified Registered Nurse Practitioner ("CRNP") Becky Pata was informed that Mr. Stewart fractured his L1 three months prior, had experienced right shoulder pain since booking, and had a history of herniated discs. (*Id.* at Ex. 2, at 16). Because Mr. Stewart was "obviously in a great deal of pain" and limping, Defendant CRNP Pata had Mr. Stewart admitted to the emergency room, where the L1 compression fracture was confirmed. (*Id.*) Two days later, Defendant CRNP Pata charted that Mr. Stewart was "tearful," was wearing a back brace, had a wheelchair in his pod, and experienced pain in his back and left ankle, which was bruised. (*Id.*) She also charted that he "could raise his head to talk and raise on one elbow to take meds" and that he was referred to a specialist. (*Id.*)

On June 30, 2021, after reporting to Defendant CRNP Pata that he did not feel well, Mr. Stewart was taken to Norman Regional Hospital to be evaluated for pneumonia. (*Id.*) Hospital records showed that Mr. Stewart complained of shortness of breath and month-long swelling in his leg. (*Id.* at Ex. 2, at 17). Mr. Stewart's discharge paperwork stated that he needed to return to the hospital if he had "worsening symptoms or any symptoms of concern, trouble breathing, or any new symptoms or other concerns." (*Id.* at Ex. 2, at 16) (internal quotation marks omitted).

On July 4, 2021, Mr. Stewart reported to Defendant Turn Key LPN Natasha Kariuki that he had "chest pain of 10/10" and was spitting up blood. (*Id.* at Ex. 2, at 17). Defendant LPN Kariuki noticed "reddish-green mucous" in the toilet and "click[ed] a preformatted

box suggesting that Kariuki instructed Mr. Stewart to 'increase fluids, medication use, follow-up sick call if no improvement.'" (*Id.*)

On July 5, 2021, Mr. Stewart reported to Defendant LPN Albertson that he had difficulty breathing and was persistently coughing. (*Id.*) Defendant LPN Albertson instructed Mr. Stewart to "take good deep breaths so as not to get pneumonia." (*Id.*)

On July 7, 2021, Mr. Stewart reported to Defendant CRNP Pata that he was coughing up "blood[-]streaked sputum" and had heartburn. (*Id.* at Ex. 2, at 18). Defendant CRNP Pata ordered omeprazole and prednisone. (*Id.*)

On July 14, 2021, at 7:03 p.m., Mr. Stewart told Defendant Turn Key LPN Christina Meza that he "woke up with blood dripping down the side of [his] face," he was pale in appearance, had a persistent cough, and had to lean forward to breathe. (*Id.*) In response, Defendant LPN Meza ordered a generic cough medicine. (*Id.*)

At approximately 7:59 p.m. the same day, Mr. Stewart was released into the custody of a Kingfisher County deputy, who was not informed of Mr. Stewart's condition or the physician's orders to return him to the hospital if his condition worsened. (*Id.* at Ex. 2, at 19). The Kingfisher County Jail medial staff refused to complete intake of Mr. Stewart because of his medical condition, so the deputy transported Mr. Stewart to a local hospital, and he was then transferred to a hospital in Enid. (*Id.*)

On July 15, 2021, Mr. Stewart died at the hospital in Enid with "bacterial endocarditis, acute respiratory failure, congestive heart failure, and hyponatremia." (*Id.* at Ex. 2, at 20). Records also show Mr. Stewart suffered from "elevated brain natriuretic

peptide (BNP) levels, elevated liver function, elevated INR, normocytic anemia, hemoptysis, acute pulmonary edema, and pleural effusion." (*Id.*)

### B. Legal Claims

Against Defendant Chris Amason in his official capacity as sheriff of Cleveland County, Plaintiff asserts that (1) the CCJC's policy and/or practice of maintaining a deficient medical care delivery system caused the violation of Mr. Stewart's constitutional right to adequate medical care (Claim 3); and (2) the CCJC's failure to train its staff caused the violation of Mr. Stewart's constitutional right to adequate medical care (Claim 4). (Doc. 1, at Ex. 2, at 21-23).

Defendant Amason argues that Plaintiff has failed to sufficiently allege facts demonstrating a violation of Mr. Stewart's Eighth Amendment right to adequate medical care and has also failed to adequately allege municipal liability. (Doc. 10).

## II. Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556); *see also Gee v. Pacheco*, 627 F.3d 1178, 1184 (10th Cir. 2010). In applying this standard, the court must "accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[, and t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### III.   Municipal Liability Under the *Monell* Doctrine

Section 1983 "creates a private right of action against any person who, under color of state law, deprives another individual of 'any rights, privileges or immunities secured by the Constitution and laws.'" *Ripley v. Wyo. Med. Ctr., Inc.*, 559 F.3d 1119, 1121-22 (10th Cir. 2009) (quoting 42 U.S.C. § 1983). In naming Defendant Sheriff Amason in his official capacity, Plaintiff has effectively asserted § 1983 claims against Cleveland County. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) ("Suing individual defendants in their official capacities under § 1983 . . . is essentially another way of pleading an action against the county or municipality they represent."); *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) ("To the extent [plaintiff] brings a claim against [the sheriff] in his official capacity, it is the same as bringing a suit against the county."); *Brashear v. Tulsa Bd. of Cnty. Comm'rs*, 2016 WL 633374, at *5 (N.D. Okla. Feb. 17, 2016) ("Plaintiff's claims against the Board and the sheriff in his official capacity both equate to actions against [the] County. In short, they are two ways of pleading the same claim.") (citations omitted).

Under Supreme Court authority in *Monell v. Dep't of Soc. Services*, 436 U.S. 658 (1978), a county can be held liable for constitutional violations committed pursuant to official policy or custom. *Id.* at 694 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said

to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."); *see Cox v. Glanz*, 800 F.3d 1231, 1254 (10th Cir. 2015) (applying *Monell* to a county).  Thus, Cleveland County cannot be held vicariously liable for its employees' alleged constitutional violations under § 1983.  *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).  Instead, to establish municipal liability under § 1983, Plaintiff must establish three basic elements: (1) Cleveland County had an official policy or custom; (2) that "was enacted or maintained with deliberate indifference to an almost inevitable" federal rights violation; and (3) that caused a violation of Plaintiff's federal rights.  *Id*. at 769-71.

The Tenth Circuit has articulated that a municipal policy or custom may take one of five forms:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions — and the basis for them — of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)).

Here, Plaintiff alleges municipal liability against Cleveland County through a policy or custom (Claim 3) and through a failure to train staff (Claim 4).  (Doc. 1, at Ex. 2, at 21-23).

> **A.     Plaintiff Failed To Plausibly Allege Municipal Liability Against Cleveland County Through a Policy or Custom, and Thus Claim 3 Should be Dismissed.**

In Claim 3, Plaintiff alleges that Defendant Sheriff Amason "adopted, maintained and enforced a written policy or unwritten practice that denied or delayed adequate medical care for [Mr. Stewart]." (Doc. 1, at Ex. 2, at 21). Plaintiff alleges that despite the existence of a written policy requiring CCJC staff to perform safety checks on detainees in critical condition, CCJC staff has a practice of failing to perform these checks. (*Id.* at Ex. 2, at 3).

Plaintiff further alleges that Defendant Amason contracted with Defendant Turn Key to provide a medical delivery system at the CCJC but that Defendant Amason "retained full responsibility for supervising persons held at the CCJC, including those in medical segregation and those who needed medical care." (*Id.* at Ex. 2, at 2-3). The CCJC's contract with Defendant Turn Key allegedly limits Defendant Turn Key's expenditures on offsite and specialty care costs to $50,000 per year while limiting its medication expenditures to $40,000 per year. (*Id.* at Ex. 2, at 4). Plaintiff states that the medical delivery system at the CCJC exhibits the following deficiencies:

   a)   Inadequate supervision of chronic care and medically compromised persons;
   b)   Failure to adequately document the condition of medically compromised persons over time sufficient to identify material changes;
   c)   Failure to provide adequate continuity of care/planning for persons being discharged from the CCJC into the custody of another agency; and
   d)   Failure to adequately monitor or supervise operation of the medical delivery system at the CCJC to identify and address deficiencies.

(*Id.* at Ex. 2, at 22).  In support, Plaintiff provides eighteen examples of allegedly inadequate medical care delivered at various institutions that contract with Defendant Turn Key. (*Id*. at Ex. 2, at 4-14).  Three of these examples detail instances at the CCJC where a detainee either died or became incapacitated after Turn Key medical staff delayed or denied medical care. (*Id.* at Ex. 2, at 4-5).   These instances occurred in 2009, 2011, and 2014. (*Id.*)

A county may be held liable for constitutional harm caused by a deficient medical delivery system, even when that system is being operated by a third-party contractor, if a final policymaker was aware of the constitutional deficiencies and failed to take appropriate action.  *Layton v. Bd. of Cnty. Comm'rs*, 512 F. App'x 861, 871-72 (10th Cir. 2013) (summary judgment for County denied when sheriff knew of deficiencies in medical delivery system and did not remedy them); *Burke v. Regalado*, 935 F.3d 960, 1001 (10th Cir. 2019) (denying motion for judgment as a matter of law when the sheriff "furthered a policy or custom of deficient medical care at the jail characterized by inadequate training, understaffing, and chronic delays") (internal quotation marks and citation omitted).

To succeed on her policy or custom *Monell* claim against Cleveland County, Plaintiff must plausibly allege both the existence of a policy or custom of inadequate medical care at the CCJC and that Defendant Amason was on notice of an inadequate medical delivery system.  Defendant Amason contends that Plaintiff failed to do so.[2]  (Doc. 10, at 13-19, 23-24, 26).  The undersigned agrees with Defendant.

---

[2] Defendant Amason also argues that the County cannot be held liable for contracting with Defendant Turn Key.  (Doc. 10, at 13-19).  Because the undersigned does not construe the

Three examples of prior failures of the medical delivery system at the CCJC, occurring intermittently between seven and twelve years prior to Mr. Stewart's death, are insufficient to establish a policy or custom of inadequate medical care at the CCJC. While examples of misconduct occurring even twenty years prior to an incident may be probative in proving a pattern or practice, *see Pendleton v. Bd. of Cnty. Comm'rs*, No. CIV-18-707-G, 2019 WL 4752269, at *10 (W.D. Okla. Sept. 30, 2019), the misconduct must be "continuing, persistent and widespread" to constitute a custom that may support a *Monell* claim. *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008). Plaintiff's examples plausibly support the allegation that Defendant Turn Key had a pattern or practice of operating a deficient medical delivery system, as Plaintiff alleged eighteen similar failures occurring regularly across numerous facilities over many years, including the previous five years. However, because Plaintiff only stated three failures that occurred at the CCJC seven or more years ago, Plaintiff failed to plausibly allege that Cleveland County has a policy or custom of providing inadequate medical care. *See Meadows v. Whetsel*, No. CIV-14-1030-HE, 2015 WL 7016496, at *6 (W.D. Okla. Nov. 10, 2015) (policy or custom not established when there was six-year gap between pattern of misconduct and misconduct at issue).

Even if Plaintiff had adequately alleged a policy or custom of inadequate medical care at the CCJC, Plaintiff has not adequately alleged that Defendant Sheriff Amason, a

---

Amended Complaint as alleging that the act of contracting with Defendant Turn Key was unconstitutional, and because Plaintiff clarifies in her Response that she did not bring such a claim, (Doc. 14, at 15), the undersigned does not address this argument.

final policymaker for the CCJC, was on notice of the systemic deficiencies. "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). "In most instances, notice can be established by proving the existence of a pattern of tortious conduct." *Id.* Deliberate indifference may be found absent such a pattern in "a narrow range of circumstance" where a constitutional violation is a "highly predictable or plainly obvious consequence of a municipality's action or inaction." *Waller*, 932 F.3d at 1284 (internal quotation marks omitted).

Plaintiff states that the "prior deaths [at jails that contracted with Turn Key] provided Amason and/or Turn Key with notice that the medical care delivery system at the CCJC is inadequate and exposed people to a substantial risk of serious harm or death." (Doc. 1, at Ex. 2, at 14). Though it is plausible that Defendant Turn Key would have known of its own pattern of tortious conduct across numerous facilities, Plaintiff has not alleged facts suggesting that Defendant Amason knew or should have known about Turn Key staff's failures at other institutions. As stated above, the three CCJC examples are not sufficient to prove a pattern or practice, and they were thus not sufficient to put Defendant Amason on notice that Turn Key operated an inadequate medical delivery system at the CCJC. *See Blueberry v. Comanche Cnty. Facilities Auth.*, 672 F. App'x 814, 817 (10th Cir. 2016) (holding that notice was not established when a pattern or custom was not established). Furthermore, Plaintiff has not introduced facts suggesting that Defendant

11

Amason was aware of specific deficiencies that would make a constitutional violation highly predictable or plainly obvious. Thus, Plaintiff has failed to adequately allege that the County was deliberately indifferent to the operation of an inadequate medical delivery system at the CCJC.

Because of the above insufficiencies, Plaintiff's policy and custom *Monell* claim against Defendant Amason (Claim 3) should be dismissed for failure to state a claim.

### B. Plaintiff Failed To Plausibly Allege Municipal Liability Against Cleveland County Through a Failure to Train, and Thus Claim 4 Should be Dismissed.

Plaintiff also alleges a *Monell* claim against Defendant Amason based on a failure to adequately train staff "to identify and document medical emergencies or to elevate care decisions for at-risk people like [Mr. Stewart]." (Doc. 1, at Ex. 2, at 23). Plaintiff alleges that "the lack of cross-training between Amason and Turn Key caused each entity to view the other as having primary responsibility for supervising the serious medical needs of medically compromised detainees." (*Id.* at Ex. 2, at 3). Defendant Amason argues that Plaintiff did not adequately allege the existence of a training deficiency, deliberate indifference to the need for training, or an underlying constitutional violation. (Doc. 10, at 21-24, 30-32).

A plaintiff need not allege a § 1983 claim against an individual officer to impose liability on a municipality for failing to train its employees. However, a plaintiff still must allege that an individual officer's conduct directly caused constitutional injury. *See Trigalet v. City of Tulsa*, 239 F.3d 1150, 1156 (10th Cir. 2001) ("In sum, we hold that absent a constitutional violation by the individual police officers whose conduct directly

12

caused plaintiffs' injuries, there can be no municipal liability imposed on the City of Tulsa . . . ."); *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998) ("[T]he plaintiffs' failure to train claims . . . require[] a predicate showing that the officers did in fact use excessive force against [the decedent]."). "A failure-to-train claim may not be maintained without a showing of a constitutional violation by the allegedly un-, under, or improperly-trained officer." *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1187 (10th Cir. 2020).

Plaintiff makes various factual allegations regarding the inadequate actions of Turn Key employees despite knowledge of Mr. Stewart's worsening condition and the obviousness of his symptoms. (Doc. 1, at Ex. 2, at 17-20). However, Plaintiff does not clearly allege that particular conduct performed by a particular untrained nurse and/or jail staff member violated Mr. Stewart's Eighth Amendment rights. Since Plaintiff is represented by counsel, the undersigned may not liberally construe her Amended Complaint. *See Healey v. Scovone*, 188 F.3d 518, at *1 n.1 (10th Cir. 1999) (unpublished table opinion); *Shepherd v. RSM Dev., Inc.*, No. CIV-19-129-R, 2019 WL 2167422, at *2 (W.D. Okla. May 17, 2019). Plaintiff's failure to plausibly allege the underlying constitutional violation is detrimental to her failure-to-train claim. Furthermore, as discussed above, Plaintiff also fails to adequately allege that a pattern of misconduct put Defendant Amason on notice of any deficiencies in the medical care system – including a need for training – or that particular deficiencies made a constitutional violation nearly certain to occur. Thus, Plaintiff's *Monell* claim against Cleveland County based on inadequate training (Claim 4) should be dismissed for failure to state a claim.

## IV. Request for Leave to Amend or for Pre-Answer Discovery

In Plaintiff's Response to the Defendant Amason's Motion to Dismiss, Plaintiff requests the Court grant leave to amend the Amended Complaint to address any deficiencies identified by the Court, or in the alternative, to order limited pre-answer discovery. (Doc. 14, at 20). At this time, the undersigned **denies** both of these requests. Plaintiff may object to this Report and Recommendation to the extent she disagrees with the undersigned's conclusions. 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Furthermore, to request leave to amend, Plaintiff must submit a separate motion with the proposed amendment attached as an exhibit, per the local rules. LCvR7.1(c); LCvR15.1.

## V. Recommended Ruling and Notice of Right to Object

For the reasons discussed above, the undersigned recommends that the Court **GRANT** Defendant's Amason's Motion to Dismiss the Amended Petition (Doc. 10).

**The undersigned advises the parties of their right to file an objection to this Report and Recommendation with the Clerk of Court on or before September 6, 2024,** under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). The undersigned further advises the parties that failure to file a timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal issues contained herein. *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation does not terminate the referral in this matter.

ENTERED this 23rd day of August, 2024.

AMANDA MAXFIELD GREEN
UNITED STATES MAGISTRATE JUDGE